**PARCC HEALTH CARE, INC.**

v.

**UNITED STATES of America**

**No. 3:01CV379.**

United States District Court, D. Connecticut.

June 27, 2002.

**436**

Kenneth A. Votre, Votre & Associates, New Haven, CT, for Plaintiff.

Alejandro L. Bertoldo, Elizabeth Lan, U.S. Department of Justice Tax Division, Washington, DC, for Defendant.

## MEMORANDUM OF DECISION ON CROSS MOTIONS FOR SUMMARY JUDGMENT [16, 21]

ARTERTON, District Judge.

Plaintiff PARCC Health Care, Inc. ("PARCC") seeks a refund of penalties assessed by the Internal Revenue Service against it for returned checks, failure to timely file quarterly federal employment tax returns and failure to deposit and pay employment taxes withheld from its employees. PARCC and the United States have now cross-moved for summary judgment. While PARCC does not dispute that it committed the violations, the parties disagree as to whether PARCC is liable for the penalties.

### I.  Factual Background

PARCC operates Astoria Park, a skilled nursing home facility in Bridgeport, Connecticut. PARCC has been owned by Donald Franco since April 1985. Franco is the president, chief executive officer and sole shareholder of PARCC, and he and his wife are the sole members of PARCC's board of directors. During the relevant time period, Michael Fiore was the administrator of PARCC, and Franco was the assistant administrator.

PARCC's data processing for receivables, payables and cost reports is handled by Paragon Group, a management services corporation. Franco is the president and CEO of Paragon Group. In 1985, Paragon Group hired Colleen Hartigan, a licensed CPA, as a controller. She was later promoted to chief financial officer of Paragon Group. Her duties included preparing

payroll tax returns, corporate income tax returns, payroll checks, Medicare and Medicaid cost reports and the company's monthly financial statements. Hartigan also took care of the company's financial books and records. She was authorized to use Franco's signature stamp to prepare checks, including payroll checks, on behalf of PARCC. Hartigan resigned from Paragon in August 1998.

Franco claims that Fiore, PARCC's administrator, and he were responsible for determining which of PARCC's creditors were paid each month, and that Hartigan also participated in that decision-making. Franco Aff. ¶ 53. According to Franco,

> Ms. Hartigan, Mr. Fiore and I would get an accounts payable journal every month and would look at those vendors that had to be paid and would look at the dollars that they received for that period or that month and they would choose vendors and what they would pay them and would send that down to Paragon to cut checks. Due to our obligations to our patients to 'feed, house and care for them, and our obligations under Connecticut law, to maintain staffing to care for patients in our facility[,][a]t times, essential services were paid before the IRS.

Franco Aff. ¶ 53; *see also id.* at ¶ 54 ("PARCC paid vendors providing essential services to patients, before obligations to the IRS."). Hartigan maintains that she "had limited input with respect to the company's finances." Hartigan Aff. ¶ 7. It is undisputed that the payroll tax information was not included on the vendor lists of creditors to be paid. Franco dep. at 104–05.

Franco claims that "[a]t no time did Ms. Hartigan tell me that federal taxes were not being paid." Franco Aff. at ¶ 55; *see also id.* at ¶ 58 ("During the periods at issue in this lawsuit, Ms. Hartigan never

informed me of the insufficient funds to pay the payroll and the payroll taxes to the IRS."). In his deposition, Franco similarly stated that Hartigan "never told me that those payroll taxes weren't being paid," and that he never asked her about it because he assumed they were being paid. Franco dep. at 75. The Government, however, has submitted an affidavit from Hartigan, in which she states:

> During the periods at issue in this lawsuit, there were insufficient funds to pay all of the creditors of PARCC, including the withholding taxes to the IRS. During the periods at issue in this lawsuit, I informed Mr. Franco of the insufficient funds to pay the payroll which included payroll taxes to the IRS, however, Mr. Franco was not interested in discussing this matter with me. Instead, Mr. Franco told me which creditors to pay, to make sure employees were paid, and to make payment arrangements with the IRS, which I did on at least three separate occasions. The payments were made out of Paragon's office as authorized by Paragon. The reason why the payroll taxes were not being paid for PARCC to the IRS was because PARCC was not taking in enough money at that time. Before I left Paragon Group, I gave Mr. Franco a pile of uncashed checks, which were not given to creditors because there was not enough money in the bank account of PARCC to cover these checks.

Hartigan Aff. ¶ 9.

According to Franco, Hartigan "had complete control over payroll and corporate taxes. She did not need permission to pay the taxes, to file the returns or to deposit the payroll taxes. I generally do not nor was I offered the opportunity to review Ms. Hartigan's books." *Id.* Franco explained that because Ms. Hartigan was a CPA, he relied on her expertise and

did not retain outside accountants to review the returns. *Id.* at ¶¶ 55–56. Hartigan signed PARCC's quarterly tax returns for the quarterly periods ending September 30, 1994 through December 31, 1997 (the periods at issue in this litigation). Franco and Hartigan signed the annual federal unemployment returns. *Id.* Hartigan maintains that she left employment with Paragon because of "the lack of input . . . from Mr. Franco with respect to the company's finances. Although I was supposed to have weekly meetings with Mr. Franco, these meetings were frequently canceled by Mr. Franco." Hartigan Aff. ¶. 3.

After Hartigan ceased working at PARCC, Franco claims that he "ultimately [found] evidence of mismanagement by her with respect to the payroll taxes at issue in this lawsuit. In fact, I found checks drawn to the IRS which appeared on statements created by Ms. Hartigan which were not sent to the IRS." *Id.* at ¶ 59.

The penalties at issue here began to be assessed in October 1995, and continued to be assessed through September 1998. The IRS Certificates of Assessments and Payments detail a series of partial and late payments by PARCC throughout this time period and the imposition of various penalties for the late payments, some of which were paid by PARCC. In March 1999, the IRS received requests for abatement of penalties from PARCC. In the request for refund and abatement, PARCC cited Hartigan rather than the its financial condition as the cause of the late or missing payments. The claims for refund were denied by the IRS on March 11, 1999.

PARCC now claims that its financial condition was the reason taxes were unpaid. PARCC receives reimbursement from the state of Connecticut under Medicaid based upon cost reports filed with the state Department of Social Services the previous year. Hartigan prepared the costs reports for the periods at issue in this litigation, and Franco states that he signed them but did not review the reports. Franco Aff. ¶ 60.

For the year October 1, 1994 through September 30, 1995, PARCC's cost report indicate that it spent $13,177 for holiday parties and/or gifts to staff, $2,138 for employee travel, $8,510 for education expenses related to seminars and conventions, $4,386 for automobile expenses and $9,674 for entertainment. According to Franco, these were reimbursable expenses paid by the Medicaid system, and "[i]f these funds had not been expended as set forth in the cost reports, we would not have received reimbursement for them. They would not have been available to pay taxes. Our rates would simply have fallen lower." *Id.* at ¶ 61. During the 1994 cost year, PARCC paid $1,386,766 in rental payments to Franco, who claims to have used those payments to pay the mortgage owed on the facility.[1] Franco states that he made no profit on the rental of the property to PARCC. Franco also states that he paid over $11,386,766 in mortgage payments, taxes and escrow funds.[2] Total wages and salaries paid by PARCC for the 1995 cost year were $3,942,149. PARCC paid the total amount of $458,991 for worker's compensation, health and life insurance for the 1995 cost year.

---

1. PARCC does not own the land and buildings on which it is located. Franco refinanced the mortgage with a HUD-issued loan of approximately $9,300,000 to obtain a lower interest rate.

2. This is presumably a typographical error, as the rental payments from PARCC to Franco were $1,386,766.

During the 1995 to 1996 cost year, PARCC reported spending $7,879 for holiday parties and/or gifts to staff, $2,976 for employee travel, $6,078 for education expenses related to seminars and conventions, $7,110 for automobile expenses and $6,663 for entertainment. These expenses were reimbursed by Medicaid. The total wages and salaries paid in the 1996 cost year was $3,827,088, and PARCC paid an additional $473,267 for workers' compensation, health and life insurance for employees. PARCC also paid $1,029,343 in rental payments to Franco. The rental payments were reduced in 1995 after Franco refinanced the mortgage to reduce the rate from fourteen percent to eight percent. Again, Franco asserts that all rental payments were applied to the mortgage payments. Franco Aff. ¶ 62.

For the 1996 to 1997 cost year, PARCC reported spending $3,049 for holiday parties and/or gifts to staff, $2,384 for employee travel, $10,854 for education expenses related to seminars and conventions, $2,940 for automobile expenses and $7,718 for entertainment. PARCC's rental payments to Franco for the 1997 cost year were $1,071,592. PARCC paid $3,696,703 in wages and salaries, and an additional $388,035 for workers' compensation, health and life insurance for employees. These expenses were reimbursed by Medicaid.

Franco asserts that during 1994 to 1995, PARCC sustained unexpected losses of $1,240,490.[3] These losses were caused by a loss of over $600,000 in revenue as a result of certain Medicare take-backs, which are funds withheld by Medicare because of claimed prior year over-payments, as well as major rate reductions by Medicaid. Franco claims PARCC sustained losses exceeding $1,000,000 in 1996 and 1997. According to Franco, from 1993 to

1998, "Medicaid cut PARCC's rates substantially due to the rate setting procedure in Connecticut." Franco Aff. ¶. 71. Although PARCC appealed each reduction, "because the rate setting was based upon prior year figures, the rate caused a massive reduction in revenues." *Id.* Franco also asserts that "during the periods at issue, my salary was decreased. PARCC did not give raises to its employees for over eighteen months. No employees were laid off because of minimum staffing requirements of Connecticut law. Benefits to PARCC's employees were not decreased nor were they increased." Franco Aff. at ¶ 65. It is undisputed that PARCC's operations and programs were not scaled back during this time period, and PARCC did not consider that an option because cutting-back operations would have led to a reduction in revenue. Franco dep. at 118–19.

## II. Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It may be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue of fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In assessing the record, the Court draws all reasonable inferences

---

**3.** The previous year (1993–94), PARCC had losses of only $30,802. Franco asserts that

"[t]his was a normal year for PARCC." Franco Aff. ¶ 68.

and resolves all ambiguities in favor of the non-moving party. *Ametex Fabrics, Inc. v. Just In Materials, Inc.*, 140 F.3d 101, 107 (2d Cir.1998) (citations omitted).

On cross-motions for summary judgment "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it. When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993) (*citing Schwabenbauer v. Board of Educ. of Olean*, 667 F.2d 305, 313 (2d Cir.1981)). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer*, 667 F.2d at 314.

### III. Discussion

The Internal Revenue Code requires employers to deduct and withhold an employee's contributions to Social Security and Medicare ("FICA") and income taxes from the employee's wages. *See* 26 U.S.C. §§ 3102(a), 3401. Withheld income taxes are held by the employer in trust for the United States, and must be deposited in an approved bank at specified intervals, depending on the amount withheld. *See* 26 U.S.C. §§ 7501(a), 6302. In addition, employers must file quarterly payroll tax returns indicating the amounts withheld from employees and the taxes to be paid. *See* 26 U.S.C. § 6011(a). When the quarterly returns are filed, the employer must also make full payment of the FICA taxes for that quarter, if they have not already been deposited with an approved financial institution. *See* 26 U.S.C. § 6151. Employers are also subject to unemployment tax with respect to each employee, and must file annual unemployment tax returns. *See* 26 U.S.C. §§ 3301, 6071.

If any employer does not timely comply with these requirements, the tax code imposes various penalties. *See* 26 U.S.C. §§ 6651 (penalties for failure to timely file return and pay required taxes), 6656 (penalties for failure to timely make required payroll tax deposits), 6657 (penalties for returned checks). Sections 6651 and 6656 provide that penalties imposed pursuant to those sections shall not be imposed where the failure to comply was due to "reasonable cause" and not "willful neglect." Section 6657 provides that penalties for returned checks "shall not apply if the person tendered such check in good faith and with reasonable cause to believe it would be duly paid." 26 U.S.C. § 6657; 26 C.F.R. § 301.6557–1(b).

### A. "Reasonable cause"

Treasury Department regulations interpreting the term "reasonable care" provide that:

If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause. A failure to pay will be considered to be due to reasonable cause to the extent that the taxpayer has made a satisfactory showing that he exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship (as described in § 1.6161–1(b) of this chapter) if he paid on the due date. In determining whether the taxpayer was unable to pay the tax in spite of the exercise of ordinary business care and prudence in providing for payment of his tax liability, consideration will be given to all the facts and circumstances of the taxpay-

er's financial situation, including the amount and nature of the taxpayer's expenditures in light of the income (or other amounts) he could, at the time of such expenditures, reasonably expect to receive prior to the date prescribed for the payment of the tax.... A taxpayer will be considered to have exercised ordinary business care and prudence if he made reasonable efforts to conserve sufficient assets in marketable form to satisfy his tax liability and nevertheless was unable to pay all or a portion of the tax when it became due.

In determining if the taxpayer exercised ordinary business care and prudence in providing for the payment of his tax liability, consideration will be given to the nature of the tax which the taxpayer has failed to pay. Thus, for example, facts and circumstances which, because of the taxpayer's efforts to conserve assets in marketable form, may constitute reasonable cause for nonpayment of income taxes may not constitute reasonable cause for failure to pay over taxes described in section 7501 that are collected or withheld from any other person.

26 C.F.R. § 301.6651–1(c)(1) & (2).

Finally, 26 C.F.R. § 1.6161–1(b) defines undue hardship as follows:

The term "undue hardship" means more than an inconvenience to the taxpayer. It must appear that substantial financial loss, for example, loss due to the sale of property at a sacrifice price, will result to the taxpayer for making payment on the due date of the amount with respect to which the extension is desired. If a market exists, the sale of property at the current market price is not ordinarily considered as resulting in an undue hardship.

The Second Circuit has recently held that financial difficulties may, under some circumstances, establish reasonable cause for a failure to pay taxes, including employee withholding, or "trust fund" taxes, relying in part on these Treasury regulations, which "clearly require a factual assessment of the taxpayer's financial situation to determine whether it has exercised ordinary business care and prudence in responding to competing financial obligations." *Fran Corp. v. United States,* 164 F.3d 814, 819 (2d Cir.1999). In *Fran Corp.,* the Second Circuit affirmed the district court's holding that the corporation had failed to demonstrate reasonable cause for failure to file and pay its taxes, and therefore did not reach the issue of whether the failure to pay was due to willful neglect. *Id.* The corporation in that case argued that it had not paid its taxes because the funds were needed to complete two construction projects to avoid default; however, the Second Circuit noted that it: had paid rent to its president during the period of delinquency, despite the fact that the president owed the corporation over $150,000; had continued to fund automobile leases and repairs that were admittedly not essential for the business; and had over $15,000 in entertainment expenses, characterized by the corporation as business development expenses, that were clearly not necessary to the completion of the two projects. *Id.* at 819–20. The court also found that "[p]erhaps most important is Fran's failure to provide any evidence to show that it placed its obligations to the IRS before those to any and all creditors not directly related to the two projects that defaulted. Absent such a showing, Fran cannot demonstrate that it acted prudently in disregarding its legal obligations to pay and deposit the employment taxes." *Id.* at 820.

Here, PARCC argues that it had reasonable cause for the failure to pay its taxes because of its financial difficulties,

noting that Franco re-financed his mortgage in 1994 to reduce the rental payments owed by PARCC by over $400,000 per year, and that PARCC "cut costs wherever possible" and appealed the rate decreases. PARCC Br. at 13. PARCC therefore claims to have acted prudently in the face of an unexpected $1.2 million loss in 1994. Because of the nature of PARCC's business, it maintains that it could not have scaled back operations under law without jeopardizing the care and well-being of patients, and that any "reduction in staff, ordering business expenses, rent or other factors will simply reduce the reimbursement." *Id.* at 14–15. Citing the state reimbursement policy, PARCC argues that its travel, education and gift expenditures cannot be deemed imprudent because cutting back these projected expenditures would have resulted in a "take back" by the state. PARCC contends that "[a]ll of the arguments raised by the United States would have caused the closing of the facility and harm to all the patients." PARCC Br. at 13. PARCC further argues that its failure to file the tax returns was attributable to Hartigan's conduct, and should be excused because she failed to inform Franco that the returns were not being filed.[4]

The Government, in turn, argues that neither mismanagement by Hartigan nor the financial difficulties described by Franco are sufficient to establish reasonable cause. First, the Government argues that because PARCC failed to implement any internal controls to ensure that its tax responsibilities were met, the exclusive reliance on Hartigan demonstrates a lack of ordinary business care and prudence. In *United States v. Boyle,* the Supreme Court held that the taxpayer's reliance on an attorney to file a tax return was not reasonable cause for failure to meet a deadline, where the claim was not that the attorney's erroneous legal advice led the taxpayer to file late but simply that the attorney failed to file any tax return at all. 469 U.S. 241, 250–52, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985). The Supreme Court observed that:

> To say that it was "reasonable" for the [taxpayer] to *assume* that the attorney would comply with the statute may resolve the matter as between them, but not with respect to the [taxpayer's] obligations under the statute. . . . It requires no special training or effort to ascertain a deadline and make sure that it is met. The failure to make a timely filing of a tax return is not excused by the taxpayer's reliance on an agent, and such reliance is not "reasonable cause" for a late filing under § 6651(a)(1).

*Id.* at 250, 252, 105 S.Ct. 687 (emphasis in original).

In support of its contention that Hartigan's failure to file returns is not reasonable cause, the Government relies on *Universal Concrete Products Corp. v. United States,* 90–2 U.S.T.C. ¶ 50,440, 1990 WL 106584 (E.D.Pa. July 24, 1990) ("a corporation's failure to implement internal checks and controls over the employee responsible for tax obligations demonstrates a lack of ordinary business care and prudence, and as such, negates a claim that late filings, deposits, and payments are due to reasonable cause"), *aff'd* 941 F.2d 1204 (3d Cir. 1991); *Thom v. United States,* 80–2 U.S.T.C. ¶ 9814, 1980 WL 1690 (D.Or. Oct. 23, 1980) (failure of unsupervised bookkeeper to file tax returns not reasonable cause); *Obstetrical & Gynecological Group, P.A. v. United States,* 79–2

---

4. At oral argument, PARCC conceded that the penalties for bounced checks were properly assessed.

U.S.T.C. ¶ 9511, 1979 WL 1419 (D.Colo. July 6, 1979) (lack of supervision of employee who knew of duty to file tax returns was evidence that failure to file had no reasonable cause).

■ The Court agrees with the Government that PARCC has not offered any evidence from which a reasonable fact-finder could conclude that the failure to file tax returns was attributable to reasonable cause and not willful neglect. Even if PARCC acted reasonably in trusting Hartigan, a trained CPA, to file the returns, no explanation has been offered for her failure to do so. Accordingly, the Government is entitled to summary judgment as to the claims for refund of penalties based on late filed returns.

The Government argues that because PARCC met its other financial obligations during the relevant time period, did not reduce salaries (other than Franco's), made its rental payments to Franco, and paid entertainment, travel, automobile and education expenses, it has failed to demonstrate that its financial difficulties were so great as to excuse payment of its taxes. The Government also notes that although PARCC froze salaries in 1995, the freeze was in place only for eighteen months, and then PARCC offered raises again.[5] Finally, the Government argues that PARCC has offered no evidence that it made any effort to comply with federal tax laws, as required by *Fran Corp.*

PARCC relies on *East Wind Industries, Inc. v. United States*, 196 F.3d 499 (3d. Cir.1999), in which the Third Circuit found both reasonable cause based on financial hardship and a lack of willful neglect where the taxpayers had initially acceded to bribery demands of corrupt defense agency employees who were the sole purchasers of the goods manufactured by the taxpayers, and then, after the taxpayers refused to pay the bribes, refused to honor existing contracts or consider the taxpayers for new contracts. The taxpayers eventually sued the defense agencies, and recovered $2.1 million in settlement, but not before they failed to pay withholding taxes for six years. The Third Circuit noted that although the taxpayers had chosen to pay other creditors and employees before the IRS, the taxpayers had proven that they exercised ordinary business care and prudence and that undue hardship would have resulted if they had paid the taxes when due. *Id.* at 509–10. As evidence of undue hardship, the court considered that the owners of the corporation "incurred substantial personal debts by obtaining loans and a mortgage on their residence in order to provide additional cash for the taxpayers to stay in business," rent was not paid, suppliers were not paid the personal funds were used to pay only essential creditors and a small number of employees retained to re-work the inventory, had those employees not been retained, the taxpayers would have been unable to function as a going concern, and finally, that only market for the taxpayers' inventory was the corrupt defense agencies. The court also found that the taxpayers had exercised ordinary business care and prudence in providing for the payment of their taxes:

> Any income received by the Taxpayers on government contracts was used to pay either taxes owed to the IRS or employees' wages. Consequently, the Taxpayers did not pay suppliers, rent, health and welfare premiums, employees' union dues, and workers' compensation insurance premiums. Utility companies were only paid from [the vice-president's] personal funds at the eleventh hour after the companies threat-

---

5. Franco contends that this was done to avoid losing critical staff and avoid unionization.

ened to shut off service.... [The vice-president] secured a mortgage on his personal residence and sold several personal assets to obtain cash to pay creditors after [his] personal funds were depleted.... Finally, the evidence shows ... that if the Defense Agencies had paid the Taxpayers what was owed under the contracts, the Taxpayers would have had sufficient funds to pay their employment taxes and other debts when due. Thus, it appears that the Taxpayers made reasonable efforts to conserve sufficient assets in marketable form, by maintaining $750,000 of inventory for the Defense Agencies, to satisfy their tax liability, and despite such efforts, were unable to pay their employment taxes when they became due.

*Id.* at 510–11.

This case clearly falls somewhere between *Fran Corp.* and *East Wind.* PARCC's financial troubles appear to have been caused by unexpected rate-cutting in 1994 by the state of Connecticut, rather than its own expenditures. Further, the nature of PARCC's business is claimed to have been such that essential vendors had to be paid to ensure adequate care of its patients and compliance with state and federal law. As the Second Circuit noted in *Fran Corp.*, to prevail on a claim of undue financial hardship, PARCC must provide evidence to show that "it placed its obligations to the IRS before those to any and all creditors not directly" necessary to its survival as a going concern. *Id.* at 820. Although the Government notes that PARCC has not offered any evidence oth-er than Franco's affidavit that all the payments to creditors were necessary to avoid incurring penalties from the state, the Government has not offered any evidence suggesting that Franco's affidavit testimony is inaccurate in this respect.[6]

In *Fran Corp.*, the Second Circuit noted that "it will be the rare case where the government is made the 'unwilling partner in a floundering business,' without the employer incurring the duty to pay a penalty for having made such a choice, but it nonetheless remains for the court in each case to weight all of the factors identified in the Regulations." 164 F.3d at 819 (*quoting Brewery, Inc. v. United States,* 33 F.3d 589, 593 (6th Cir.1994)). PARCC argues that the nursing home industry is so highly regulated that the Government—although admittedly not the IRS—is more akin to a voluntary partner in a struggling industry. According to PARCC, it would have been subject to federal civil and/or criminal penalties if it used the Medicare funding to pay taxes rather than for patient care and state Department of Health standards impose minimum staffing and other requirements. Thus, PARCC maintains that the unexpected reduction in rates in 1994 and the "take backs" created financial difficulties that it struggled to overcome for several years. The Government has not rebutted this claim of financial hardship with evidence that PARCC's expenditures were not necessary, or would not have resulted in even more detrimental "take backs."

Whether reasonable cause exists is a question of fact, and on this record, neither the Government nor PARCC has shown

---

**6.** More troubling, however, is the Government's observation that some of the losses claimed by Franco are not corroborated by the supporting documentation. Thus, the corporate tax returns reflect a loss for the 1995 to 1996 years of approximately $450,000 and a 1996 to 1997 year loss of approximately $25,000, less than half the $1,000,000 loss for those two years that Franco claimed was sustained. While the Government also alleges that PARCC has failed to offer evidence (other than the tax returns) that its financial losses were as great as reflected in the tax returns, the Government has not offered anything to suggest that the losses reflected in PARCC's corporate tax returns are inaccurate.

that, drawing all inferences in the favor of the other party, a reasonable fact-finder would be compelled to conclude either that PARCC would have had such an undue burden if it had timely complied with its tax requirements that it had reasonable cause, or that PARCC's conduct was so lacking in diligence that it lacked reasonable cause as a matter of law. Thus, the Court concludes that whether or not PARCC's financial difficulties establish reasonable cause and not willful neglect for the failure to pay corporate taxes and to deposit withholding taxes remains a disputed issue for trial.

### B.    "Willful neglect"

The Supreme Court has held the term "willful neglect" means "a conscious, intentional failure or reckless indifference." *Boyle,* 469 U.S. at 245, 105 S.Ct. 687 (citations omitted). "In other words, 'a taxpayer seeking a refund must therefore prove that his failure ... was the result neither of carelessness, reckless indifference, nor intentional failure.' " *Fran Corp.,* 164 F.3d at 816 (*quoting Boyle,* 469 U.S. at 246 n. 4, 105 S.Ct. 687).

The Government also argues that PARCC's failure to meet its tax obligations was willful neglect, in light of Franco admissions that he failed to confirm that the returns were timely filed and simply assumed the payroll tax deposits were being made. According to the Government, because it is undisputed. that PARCC failed to institute any safeguards to ensure compliance, this apathy demonstrates reckless indifference, and therefore willful neglect. The Government maintains that reposing all payment responsibility in one individual is willful neglect as a matter of law. The Court, finding no authority for such a proposition, declines to adopt such a *per se* rule.

In *East Wind,* the Third Circuit rejected the government's position that any intentional failure to pay employment taxes amounts to willful neglect, noting that:

> The IRS has consistently taken the position that if a taxpayer cannot afford to pay trust fund taxes, no matter what the cause, it should close up shop. Both the economy and the federal fisc are negatively impacted by such an approach— the amount of money flowing into the economy and the fisc is reduced as a result of increased unemployment, idle buildings and plants, and decreased sales of goods and services. Under this approach, no one benefits. Where, however, a taxpayer keeps its business operating at a minimal level in order to collect moneys contractually due so that it can pay trust fund taxes and other debts, and does in fact collect the funds owed and pays its back taxes and other debts, the economy and federal fisc, including the IRS, benefits.

196 F.3d at 509. A critical fact in *East Wind,* however, was the role the government itself, as the defense agencies, played in causing the financial hardship suffered by the taxpayers. The court emphasized that this suggested that "the Government was not an unwilling partner in a floundering business, but an active participant." *Id.* Further, the court noted that the taxpayers' vice president had stated in his deposition that he paid "only those creditors whose services were essential to maintaining and reworking the inventory ... [and] that maintaining minimal business operations was required to institute adversary proceedings against the Defense Agencies and collect the $2.1 million settlement. . . . [He] further testified that he felt he had no choice but to pay employees from the funds received under government contracts because Delaware law makes it a criminal violation not to pay employees for time worked." *Id.* The court held that

under these circumstances, the decision "to pay those creditors, whose services were essential to maintaining and reworking the inventory, over the trust fund taxes" was not "a conscious, intentional failure or reckless indifference" and therefore not willful neglect. *Id.*

■ From a review of the certificates of assessments, it is evident that PARCC made partial payments during this period, and that it was assessed and paid multiple penalties for the late filings. Hartigan's affidavit further makes clear that these payments were late because of the company's financial difficulties. Under these circumstances, PARCC's reliance on a single employee has not been shown to be unreasonable, and the evidence in the record does not compel the conclusion that the failure to file taxes was either a conscious, intentional failure or reckless indifference. Accordingly, summary judgment on the grounds of willful neglect is inappropriate.

## IV. Conclusion

For the reasons set forth above, PARCC's motion for summary judgment [# 21] is DENIED. The Government's motion for summary judgment [# 16] is GRANTED IN PART as to the claims for refunds of penalties based on the failure to file tax returns and bounced checks, and is DENIED IN PART as to the claims for refunds of penalties based on the failure to timely pay taxes.

IT IS SO ORDERED.