S & M INVESTMENT CO., a California general partnership, Plaintiff–Appellant,

v.

TAHOE REGIONAL PLANNING AGEN-CY, a public entity, Does I through XXX, inclusive, Defendant–Appellee.

No. 89–15353.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 19, 1990.

Decided Aug. 15, 1990.

John S. Warnlof, Ruta Paskevicius, Nelson, Warnlof & Vencill, San Ramon, Cal., and Gregg R. Lien, Hoffman, Lien, Faccinto & Spitzer, Tahoe City, Cal., for plaintiff-appellant.

Susan E. Scholley, Tahoe Regional Planning Agency, Zephyr Cove, Nev., for defendant-appellee.

Before LIVELY,[*] FLETCHER, and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

Appellant, S & M Investment Company ("S & M"), contests the expiration of a development permit granted to it by the appellee, the Tahoe Regional Planning Agency ("TRPA"). S & M contends, first, that the period in which it had to commence construction under the permit was tolled because the project authorized by the permit was the subject of "legal action." Second, appellant asserts that TRPA should be estopped from contending that S & M's permit had expired because a TRPA staff member provided S & M with erroneous information concerning the expiration of the permit and the possibility of obtaining an extension. The district court, 702 F.Supp. 1471, granted TRPA's motion for summary judgment, and S & M appealed. We affirm.

## I. FACTS

In 1968, California and Nevada, with congressional approval, entered into an interstate agreement to provide for the conservation of resources and control of development in the Lake Tahoe Basin. The agreement, known as the Tahoe Regional Planning Compact, created the Tahoe Regional Planning Agency and authorized the agency to develop a regional development plan. Pub.L. 91–148, 83 Stat. 360 (1969). In 1973, California created the California Tahoe Regional Planning Agency ("CTRPA") to establish and enforce stricter development controls on the California side of the Tahoe Basin. Developers building on the California side of the basin were required to obtain permits from both agencies.

On February 1, 1980, S & M received a one-year permit from CTRPA for the construction of a car dealership. Later that month, on February 27th, the company obtained an eighteen-month TRPA permit. In 1980, California and Nevada amended their interstate agreement to require TRPA to take a number of specific actions in order to protect the region's environment. Pub.L. No. 96–551, 94 Stat. 3233 (1980) (the "1980 Compact"). California also agreed to deactivate CTRPA as soon as TRPA adopted a new regional plan. Cal.Gov't Code § 67131. Under the amended agreement, S & M's TRPA permit was automatically extended until December 19, 1983 (three years from the date Congress approved the 1980 Compact).[1] S & M applied for an extension of its CTRPA permit, but because CTRPA delayed and temporarily suspended action on permit extensions pending adoption of new procedures, S & M was unable to obtain one until August 7, 1981. This one-year extension was due to expire on August 7, 1982. Since the ex-

---

[*] The Honorable Pierce Lively, Senior Circuit Judge of the Sixth Circuit, sitting by designation.

1. Article VI(p) of the 1980 Compact states:
 Approval by the agency of any project expires 3 years after the date of final action by the agency or the effective date of the amendments to this compact, whichever is late [sic], unless construction is begun within that time and diligently pursued thereafter, or the use or activity has commenced....

tended permit was not granted until close to the end of the 1981 building season, S & M did not begin building that year. During the 1982 season, S & M also failed to commence construction, this time apparently due to a sharp increase in building costs. Instead, in 1982 S & M sought to file a new application with CTRPA but was unable to do so because it had not obtained the local approval required under CTRPA resolutions.

During the summer of 1982, Brian Stack, S & M's general partner, went to the TRPA office to inquire about the status of his TRPA permit. S & M alleges that Stack was erroneously informed by a staff person that the permit would expire three years from the date of agency approval of the permit application, February 27, 1983 (rather than three years from the date of congressional approval of the 1980 Compact, December 19, 1983), and that there were no provisions for extensions under any circumstances. S & M took no further steps toward commencing construction and on December 19, 1983, its TRPA permit expired by operation of law. According to S & M, had it been aware that its TRPA permit was effective for the 1983 construction season, it would have pursued its efforts to obtain the other requisite authorizations.

In September 1984, S & M wrote to TRPA to request a thirteen-month extension of its TRPA permit. S & M based this request on CTRPA's delay in extending the permit, CTRPA's adoption of resolutions requiring local approval prior to filing a new CTRPA application, and a September 1983 CTRPA moratorium on new project applications. S & M contended that these actions constituted "legal action" under Article VI(p) of the 1980 Compact, which tolls the three-year period for commencing construction when projects authorized by TRPA permits are the subject of such actions. TRPA refused to grant the extension, responding that "legal action" as used in the 1980 Compact means litigation, not all actions by governmental agencies. The TRPA governing board denied S & M's subsequent appeal, and S & M filed the instant action. The district court, in granting TRPA's motion for summary judgment, held, as TRPA had urged, that "legal action" as used in the 1980 Compact means litigation. The court also held that the alleged misinformation given by a TRPA staff member did not constitute a sufficient ground to estop the agency from enforcing the regular expiration date of S & M's permit.

## II. DISCUSSION

### A. *Definition of "Legal Action"*

■ S & M argues on appeal, as it did below, that CTRPA's adoption of resolutions and moratoria, which allegedly prevented appellant from building its car dealership, constituted "legal action," therefore tolling the period in which it was required to commence construction under its permit. We disagree. The term "legal action" as used in the 1980 Compact can only reasonably be read to mean litigation, not all lawful activities of government agencies, as appellant insists.

■ After establishing a three-year duration for project approvals, Article VI(p) of the 1980 Compact provides:

> In computing the 3–year period any period of time during which the project is the subject of a legal action which delays or renders impossible the diligent pursuit of that project shall not be counted. Any license, permit or certificate issued by the agency which has an expiration date shall be extended by that period of time during which the project is the subject of such legal action as provided in this subdivision.

When construing a statute, we look first to the plain meaning of the language in question. *Sacramento Regional County Sanitation Dist. v. Reilly*, 905 F.2d 1262, 1268–1269 (9th Cir.1990). If the term at issue has a settled meaning, we must infer that the legislature meant to incorporate the established meaning, unless the statute dictates otherwise. *See American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982) ("As in all cases involving statutory construction, ... we assume 'that the legislative purpose is

expressed by the ordinary meaning of the words used.' ") (quoting *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962)); *Black v. Commissioner of Internal Revenue*, 765 F.2d 862, 864–65 (9th Cir.1985). When the plain language of the statute appears to settle the question, "we look to the legislative history to determine only whether there is 'clearly expressed legislative intention' contrary to that language." *INS v. Cardoza–Fonseca*, 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 1213 n. 12, 94 L.Ed.2d 434 (1987) (quoting *United States v. James*, 478 U.S. 597, 606, 106 S.Ct. 3116, 3121, 92 L.Ed.2d 483 (1986), in turn quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)).

The plain meaning of the term "legal action" settles the issue before us. *Black's Law Dictionary* (5th ed.1979), while not defining "legal action," defines "action" as:

> Conduct; behavior; something done; the condition of acting; an act or series of acts.
>
> *Term in its usual legal sense means a suit brought in a court; a formal complaint within the jurisdiction of a court of law....* It includes all the formal proceedings in a court of justice attendant upon the demand of a right made by one person of another in such court, including an adjudication upon the right and its enforcement or denial by the court.

*Id.* at 26. (citation omitted) (emphasis added). And, in defining the word "litigation," *Black's* actually uses the term "legal action," stating that litigation is:

> A lawsuit. *Legal action*, including all proceedings therein. Contest in a court of law for the purpose of enforcing a right or seeking a remedy....

*Id.* at 841. Moreover, although apparently few if any courts have ever defined "legal action," literally thousands of cases have used the term to refer to litigation. *See, e.g., Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 461, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975) ("We recognize, too, that *the filing of a lawsuit* might tend to deter efforts at conciliation, that lack of success in the *legal action* could weaken the Commission's efforts to induce voluntary compliance, and that *a suit* is privately oriented and narrow, rather than broad, in application, as successful conciliation tends to be.") (emphasis added); *Boudin v. Thomas*, 732 F.2d 1107, 1114 (2d Cir.1984) ("The drafters perceived *legal actions* as helping to formulate public policy: '*An adjudication or civil action* provides a concrete, adversarial test of Government regulation and thereby insures the legitimacy and fairness of the law.' ") (quoting H.R. Rep. No. 1418, 96th Cong., 1st Sess. 10, *reprinted in* 1980 U.S.Code Cong. & Admin.News 4984, 4988–89) (emphasis added); *Local 1498, American Fed'n of Gov't Employees v. American Federation of Government Employees, AFL/CIO*, 522 F.2d 486, 490 (3rd Cir.1975) ("Consequently, however else the activities of government union officers may otherwise be subject to *legal actions*, no cause of action will lie against such officers under the LMRDA as the jurisdictional requirement cannot be met.") (emphasis added). In common usage, the term "legal action" is used to refer to litigation or judicial proceedings. We find nothing in the language or legislative history of the 1980 Compact to suggest that Congress intended differently.[2]

█ Our conclusion is supported by reference to other provisions of the 1980 Com-

---

2. Before the fusion of law and equity in the 1938 Federal Rules of Civil Procedure (Rule 2), the term "legal action" was used to refer to an "action at law," as opposed to a "suit in equity." *Ballentine's Legal Dictionary* (3d ed. 1969), for instance, still defines "legal action" as "[a]n action at law" and then defines an "action at law" as:

> An action prosecuted in a law court, as distinguished from a suit in equity. An action, the purpose of which is the recovery of a sum of money or damages, or an action wherein the only relief obtainable or appropriate is a money judgment for damages.

*Id.* at 19. However, with the elimination of the distinction between courts of law and courts of equity and the adoption of the rule establishing one form of action, Fed.R.Civ.P. 2, the term has come to refer to all judicial proceedings.

pact in which the term "legal action" appears. When the same word or phrase is used in different parts of a statute, we presume that the word or phrase has the same meaning throughout. *Firestone v. Howerton,* 671 F.2d 317, 320 n. 6 (9th Cir. 1982). The term "legal action" is used consistently in the 1980 Compact to refer to litigation. Article VI(j) of the Compact, for instance, states:

(j) *Legal actions* arising out of or alleging a violation of the provisions of this compact, of the regional plan or of an ordinance or regulation of the agency or of a permit or a condition of a permit issued by the agency are governed by the following provisions:

(1) This subdivision applies to:

(A) Actions arising out of activities directly undertaken by the agency.

(B) Actions arising out of the issuance to a person of a lease, permit, license or other entitlement for use by the agency.

(C) Actions arising out of any other act or failure to act by any person or public agency.

Such *legal actions* may be filed and the provisions of this subdivision apply equally *in the appropriate courts* of California and Nevada and of the United States.

. . . .

(4) A *legal action* arising out of the adoption or amendment of the regional plan or of any ordinance or regulation of the agency, or out of the granting or denial of any permit, shall be commenced within 60 days after final action by the agency. All other *legal actions* shall be commenced within 65 days after discovery of the cause of action.

(5) In any *legal action* filed pursuant to this subdivision which challenges an adjudicatory act or decision of the agency to approve or disapprove a project, the scope of *judicial inquiry* shall extend only to whether

there was prejudicial abuse of discretion. . . . In any *legal action* filed pursuant to this subdivision which challenges a legislative act or decision of the agency (such as the adoption of the regional plan and the enactment of implementing ordinances), the scope of the *judicial inquiry* shall extend only to the questions of whether the act or decision has been arbitrary, capricious or lacking substantial evidentiary support or whether the agency has failed to proceed in a manner required by law.

(emphasis added).

There can be no question that the term "legal action" is used in the article to refer to litigation. The article explains that legal actions can arise out of certain acts by the agency and can be filed in either state or federal court, it sets a limitations period for the commencement of such lawsuits, and it defines the scope of judicial inquiry governing various types of legal challenges. Interpreting the term "legal action" to mean any lawful action taken by a governmental agency, as appellant requests, would render Article VI(j) nonsensical. Resolutions, moratoria, and other activities of government agencies are not filed in courts and they do not involve any judicial inquiry. Moreover, it would be odd for a "legal action," as used in Article VI(j), to arise out of the very activities that appellant urges us to call "legal action." Because under that article "legal actions" *arise out of* agency actions such as the adoption or application of regulations or moratoria, "legal actions" cannot logically *consist of* such agency actions. We therefore reject appellant's construction of the term. Since S & M's project was not the subject of a "legal action" as that term is used in the 1980 Compact, TRPA and the district court correctly concluded that appellant's permit had expired.

B. *Equitable Estoppel*

 S & M argues that TRPA should be estopped from contending that the compa-

ny's TRPA permit had expired in December 1983 because a TRPA staff member gave Brian Stack, the company's general partner, erroneous information during the summer of 1982. The agency staff member allegedly told Stack that S & M's permit expired in February 1983 rather than December 1983, and stated that there was no possibility of obtaining an extension.[3]

A party seeking to invoke estoppel against the government must satisfy two requirements in addition to those ordinarily applicable. *Watkins v. United States Army*, 875 F.2d 699, 707 (9th Cir. 1989) (*en banc*), *petition for cert. filed*, 58 U.S.L.W. 3771 (U.S. May 21, 1990) (No. 89–1806).[4] First, it must establish "affirmative conduct going beyond mere negligence." *Id.* (quoting *Wagner v. Director, Fed. Emergency Management Agency*, 847 F.2d 515, 519 (9th Cir.1988)). Second, it must show that the government's act will cause a serious injustice and the imposition of estoppel will not unduly harm the public interest. *Id.*

Appellant cannot meet even the first of these requirements. The conduct at issue involves one oral misstatement by a low-level government employee.[5] In dealing with the government, an individual is charged with knowing government statutes and regulations and assumes the risk "that government agents may exceed their authority and provide misinformation." *Lavin v. Marsh*, 644 F.2d 1378, 1383 (9th Cir.1981); *see also Wagner*, 847 F.2d at 519 ("there is always a risk that misinformed agency employees may err in interpreting statutes and regulations"). In *Watkins v. United States Army*, 875 F.2d at 708, we

distinguished an isolated act of providing misinformation from "ongoing active misrepresentations" or a "pervasive pattern of false promises," holding that only the more egregious conduct amounts to affirmative misconduct justifying estoppel against the government. Moreover, "[t]he fact that the incorrect information is given orally makes it even less likely to rise to the level of affirmative misconduct." *Rider v. United States Postal Serv.*, 862 F.2d 239, 241 (9th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 2430, 104 L.Ed.2d 987 (1989).

Thus, a single oral misstatement by a government employee will ordinarily not constitute affirmative misconduct. In *Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981), for instance, the Supreme Court held that there was no affirmative misconduct when a field representative of the Social Security Administration, in response to an inquiry, erroneously informed a claimant that she was not eligible for benefits, causing her to leave the agency's office without filling out an application. Similarly, in *Mukherjee v. INS*, 793 F.2d 1006, 1009 (9th Cir.1986), we held that an incorrect statement by an American vice-consul to an alien that he was not subject to the two-year foreign residency requirement did not reach the level of affirmative misconduct required for estoppel against the INS. Given this standard, the isolated misstatement by a TRPA employee to Brian Stack cannot be held to amount to affirmative misconduct estopping TRPA from enforcing the normal expiration date of S & M's permit.

Accordingly, we hold that the district court was correct in granting TRPA's mo-

---

**3.** For the purposes of its summary judgment motion, TRPA admitted S & M's allegations concerning the misinformation given to Stack.

**4.** "Traditional estoppel requires the following: '(1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's

conduct to his injury.'" *Watkins*, 875 F.2d at 709 (quoting *United States v. Wharton*, 514 F.2d 406, 412 (9th Cir.1975)).

**5.** S & M also points to a letter sent by TRPA in February of 1984 erroneously *confirming* that S & M's permit expired in February 1983 (rather than December 1983). As this letter was sent *after* the permit had already expired, it cannot be used to estop TRPA from enforcing the regular December 1983 expiration date.

tion for summary judgment.[6]

AFFIRMED.

---

**6.** S & M also argues that there are two genuine issues of material fact precluding summary judgment. Its argument is without merit. First, S & M contends that the parties disagree whether the CTRPA moratorium was mandated by TRPA. Any such disagreement would be of no relevance here. Even if TRPA could be held responsible for CTRPA's actions, the moratorium does not constitute a "legal action" under Article VI(p), and would thus not toll the expiration of S & M's permit. Second, appellant asserts that whether the TRPA staff person intended S & M to act upon his representation is a material issue of fact. For purposes of summary judgment, TRPA conceded this issue. It is therefore not in dispute. More important, in light of S & M's inability for other reasons to meet the estoppel requirements, the undisputed fact cannot serve to preclude summary judgment.