Horace Wayne **BAIMBRIDGE**,
Plaintiff,

v.

**UNITED STATES of America**,
Defendant.

**United States of America**,
Counterclaimant,

v.

**Horace Wayne Baimbridge**,
Counterdefendant.

No. 03–CV–0939–IEG(JMA).

United States District Court,
S.D. California.

June 30, 2004.

---

Jon Harvey Lieberg, Law Offices of Jon H. Lieberg, Temecula, CA, for Plaintiff.

Jeremy N. Hendon, United States Department of Justice Tax Division, Washington, DC, U.S. Attorney CV, U.S. Attorneys Office Southern District of California Civil Division, San Diego, CA, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

GONZALEZ, District Judge.

Presently before the court is defendant-counterclaimant the United States of America's (the "government") motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons stated herein, the Court grants the motion in part and denies it in part.

### BACKGROUND

This case arises out of a series of tax penalties assessed against plaintiff-counterdefendant Horace Wayne Baimbridge

("Baimbridge") for failure to collect and remit payroll taxes on behalf of Soil Technology Laboratories, Inc. ("Soil Tech"). The undisputed facts are as follows:

Baimbridge formed Soil Tech in 1984, and was its sole shareholder until the company ceased operations in 1996. In the 1990s Soil Tech experienced severe financial trouble. During certain quarters of 1990, Soil Tech failed to pay its payroll tax liabilities.[1] From 1990 until August 1994, Soil Tech was able to keep current with its payroll tax liabilities, although it continued to experience general financial difficulties and continued to owe back taxes from the 1990 periods.

On August 5, 1994, Baimbridge sent a check to the Internal Revenue Service ("IRS") to cover Soil Tech's payroll tax liabilities for the June 1994 period. Later that month, the IRS notified Baimbridge that the check for the June 1994 period had been dishonored due to insufficient funds. On August 23, 1994, Baimbridge submitted another check to the IRS for the same amount as the dishonored check.[2] This second check eventually cleared. Unbeknownst to Baimbridge, however, the IRS applied a large part of the second payment towards his outstanding liabilities from the 1990 delinquencies, leaving his June 1994 liability partially unpaid.

Soil Tech's standing with the IRS rapidly deteriorated after this point. On October 27, 1994, Baimbridge submitted a check to cover Soil Tech's payroll tax liabilities for the September 1994 period. This check was subsequently dishonored. On December 5, 1994, Baimbridge sent a check in the amount of $32,557.95, which the IRS posted to his account as a "miscellaneous payment" but which was later dishonored as well. Later, on February 2, 1995, Baimbridge sent a check to cover the December 1994 period. This check was similarly dishonored.[3]

In light of the string of dishonored checks and the fact that Soil Tech relapsed into delinquency as to its payroll tax liabilities, the IRS scheduled a meeting with Baimbridge. This meeting took place on April 20, 1995 between Baimbridge and IRS Officer Sally McGeorge ("McGeorge"). According to Baimbridge, it was at this meeting that he first became aware that the payments for the September 1994 and December 1994 periods had been dishonored and that Soil Tech still had a partial delinquency for the June 1994 period (due to the fact that the IRS partially reallocated the payment for that period to cover the 1990 liabilities). Finally, Baimbridge alleges that he and McGeorge (on behalf of the IRS) entered into an oral installment agreement whereby Soil Tech would continue operations and make monthly payments to the IRS until all tax delinquencies were satisfied.

The oral agreement was later memorialized in writing and signed by Baimbridge

1. The 1990 delinquencies are not the subject of this litigation. Rather, as discussed below, Baimbridge contests subsequent delinquencies and penalty assessments in 1994 and 1995.

2. There is a factual dispute as to whether Baimbridge specifically designated this second payment for the June 1994 liability, or whether it was an undesignated payment. As described below, the IRS is bound to apply a designated payment towards the particular liability designated by the taxpayer, but may apply an undesignated payment in any manner it wishes.

3. Unlike the dishonored check for the June 1994 period, Baimbridge never sent in new checks for the full amount for the September 1994 and December 1994 periods. Baimbridge did, however, submit a check on February 16, 1995 for $10,500 which he allegedly designated as a partial payment for the September 1994 period (the payroll tax liability for September 1994 was well over $10,500).

on August 14, 1995 in an IRS "Form 433–D" entitled "Installment Agreement." The installment agreement covers the 1990 delinquencies, as well as the delinquencies from the June 1994, September 1994, and December 1994 periods. As to future payroll taxes, the installment agreement requires payment on time and in full. The installment agreement includes an attachment indicating that Soil Tech would make a minimum monthly payment of $3,000 with increases if billings exceeded $25,000.[4] According to Baimbridge, he entered the installment agreement because both he and McGeorge agreed that it would be in the best interests of all parties for Soil Tech to maintain operations and attempt to pay down its payroll tax delinquencies, rather than shutting down completely.

Although Baimbridge attempted to adhere to the terms of the installment agreement and keep current on Soil Tech's future payroll tax liabilities, he was unsuccessful. Soil Tech failed to pay its payroll tax liabilities for the December 1995 period. Additionally, in late 1995 or 1996, the IRS levied upon Soil Tech's accounts receivable and seized its assets. Although Baimbridge contends that the accounts receivable had a total worth of approximately $140,000, the evidence indicates that the IRS was only able to recover a little over $1,000 in payments. On December 20, 1995, Soil Tech filed for bankruptcy, and, sometime thereafter, it ceased operations completely. Until the time it ceased operations, Soil Tech continuously made payments to non-IRS creditors such as utility companies and salaried field technicians in an attempt to maintain operations.

Eventually, the IRS assessed civil penalties against Baimbridge under 26 U.S.C. § 6672 for willfully failing to collect and remit payroll taxes on behalf of Soil Tech. Four of the civil penalties, totaling $68,994.69, are at issue in this case. They are: $10,451.46 for June 1994; $25,760.40 for September 1994; $18,165.66 for December 1994; and $14,617.17 for December 1995. On May 9, 2003, Baimbridge initiated the instant lawsuit seeking a refund and abatement of the tax penalties. On August 14, 2003, the government counterclaimed against Baimbridge for the total amount of unpaid penalties plus interest. Following discovery, the government filed the instant motion for summary judgment on May 18, 2004. On June 1, 2004, Baimbridge filed his opposition. The government filed its reply on June 21, 2004. The Court now turns to a discussion of the government's motion for summary judgment.[5]

## DISCUSSION

### A. Legal Standard for Summary Judgment

"Under Rule 56(c), summary judgment is proper when the pleadings and discovery, read in the light most favorable to the nonmoving party, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Armstrong v. Burlington Northern R. Co.*, 139 F.3d 1277. 1278 (9th Cir.1998) (quoting *20th*

---

**4.** At some point, it appears that Baimbridge defaulted on the installment agreement and it was rescinded. However, it is unclear when this occurred or when the IRS notified Baimbridge.

**5.** Baimbridge raised several evidentiary objections at the June 28, 2004 hearing on the instant motion. To the extent that this Court does not rely on the evidence to which Baimbridge objects, the objections are denied as moot. To the extent that the Court relies on any such evidence, Baimbridge's objections lack merit and are also denied.

*Century Ins. Co. v. Liberty Mut. Ins. Co.,* 965 F.2d 747, 750 (9th Cir.1992)); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is "genuine" when "the evidence presented is such that a jury applying [the appropriate] evidentiary standard could reasonably find for either the plaintiff or the defendant." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

Once the moving party meets the requirement of Rule 56, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. To make such a showing, the nonmoving party must go beyond the pleadings to designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The requirement that a nonmoving party go beyond the pleadings is meant to further one of Rule 56's principal purposes, namely "to isolate and dispose of factually unsupported claims or defenses." *Id.* at 323–324, 106 S.Ct. 2548.

**B. Analysis**

 Employers are required by law to withhold federal taxes from employee wages and to pay those withheld sums to the IRS on a quarterly basis. When the payroll taxes are withheld, but before they are paid over, they are to be held in trust for the government. When a person responsible for collecting and remitting payroll taxes to the IRS willfully fails to discharge his or her duty, the IRS may assess a civil penalty against that person under 26 U.S.C. § 6672. The amount of the penalty may be as great as the amount of the delinquent payroll tax for each period. In order for civil penalties to attach under section 6672, the individual must (1) be a "responsible person" (i.e., responsible for collecting and remitting the taxes); and (2) have acted "willfully" in failing to collect or remit the withheld taxes. *United States v. Jones,* 33 F.3d 1137, 1139 (9th Cir.1994); *Davis v. United States,* 961 F.2d 867, 869 (9th Cir.1992). Once the government produces a certificate that the penalty assessments were made, it is entitled to a presumption of correctness. *Oliver v. United States,* 921 F.2d 916, 919 (9th Cir.1990).[6] The individual against whom the penalty assessment is made thus bears the burden of proving by a preponderance of the evidence that the penalty is invalid. *Jones,* 33 F.3d at 1139.

Baimbridge does not dispute that he was a "responsible person" during the periods in which the penalties were assessed.[7] Thus, only two issues are in dispute on summary judgment: (1) whether Baimbridge "willfully" failed to collect and remit payroll taxes during each of the four peri-

---

6. The government has produced appropriate Certificates of Assessment for the penalties at issue. Baimbridge's challenges to these certificates were rejected in *Purcell v. United States,* 1 F.3d 932, 940–41 (9th Cir.1993) and *Huff v. United States,* 10 F.3d 1440, 1446 n. 5 (9th Cir.1993). Therefore, the government is entitled to a presumption that the penalty assessments are correct.

7. Baimbridge does present a vague argument based on the fact that an IRS officer did not initially recommend that he was a "responsible person" for the December 1995 period. As the government correctly notes, this argument is of no consequence. No authority holds that the IRS is forever bound to a preliminary determination as to who is or is not a "responsible person."

ods and (2) whether the amount of each penalty is correct. The Court will address each issue in turn.

## 1. Willfulness

■ In the Ninth Circuit, willfulness under section 6672 is defined as a "voluntary, conscious and intentional act to prefer other creditors over the United States." *Phillips v. United States*, 73 F.3d 939, 942 (9th Cir.1996) (quoting *Klotz v. United States*, 602 F.2d 920, 923 (9th Cir.1979)). Thus, the Ninth Circuit has held that "[i]f a responsible person knows that withholding taxes are delinquent, and uses corporate funds to pay other expenses..., our precedents require that the failure to pay withholding taxes be deemed 'willful.'" *Buffalow v. United States*, 109 F.3d 570, 573 (9th Cir.1997) (quoting *Phillips*, 73 F.3d at 942). The Ninth Circuit recognizes two ways in which the government can establish willfulness. First, the government may show that the responsible person had actual knowledge that payroll taxes were not being collected or paid over, and thereafter made payment to a non-IRS creditor. Second, a responsible person may be deemed "willful" if he or she acted in "reckless disregard of whether the taxes [were] being paid over." *Phillips*, 73 F.3d at 942.

### a. Actual Knowledge

■ The government first argues that Baimbridge had actual knowledge of the tax delinquencies "at some point during 1994." [8] (Gov't Mem. at 11). However, the government's evidence does not support this proposition. The government primarily relies on a portion of Baim-

bridge's deposition in which he is asked about the dishonored checks. In his deposition, Baimbridge only states that the IRS informed him in the "middle" of 1994 that the *first* June 1994 check was dishonored. (Hendon Decl., Ex. 4 at 14). This, however, does not establish actual knowledge of a delinquency, even for the June 1994 period, because Baimbridge promptly sent in another check, which cleared, for the same amount. Drawing inferences in Baimbridge's favor, there does not appear to be any reason for him to have known of a delinquency for the June 1994 period after the second check cleared. As to the other checks (those pertaining to the September 1994 and December 1994 periods), Baimbridge, in his deposition, does not recall when he was informed that they were dishonored. (*Id.*). Contrary to the government's contention, Baimbridge states in his declaration that he was not aware of *any* delinquencies until he met with McGeoge in April 1995. Thus, while it is undisputed that Baimbridge actually knew of the tax delinquencies in April 1995 (by virtue of his meeting with McGeorge), there is a conflict in the evidence regarding actual knowledge before that time. Viewing the evidence in a light most favorable to Baimbridge, the Court will assume, for purposes of summary judgment, that Baimbridge did not have actual knowledge of tax delinquencies until April 1995. [9]

The government argues, however, that even if Baimbridge did not have actual knowledge of tax delinquencies until April 1995, summary judgment is appropriate because after that time, and continuing until Soil Tech ceased operations, Baim-

---

8. Of course, the government's actual knowledge argument can only apply to the June 1994 and September 1994 delinquencies. It would be impossible for Bambridge to know of the December 1994 and December 1995 delinquencies in 1994 because payment for those periods was not due until *after* 1994.

9. As to the December 1995 delinquency, which occurred after the April 1995 meeting, Baimbridge does not dispute his awareness, which must have arisen immediately in light of the fact that he made no effort whatsoever to pay the taxes in full for that period.

bridge made payments to non-IRS creditors. In the Ninth Circuit, the government's argument is entitled to great weight. *See Buffalow,* 109 F.3d at 573 ("If a responsible person knows that withholding taxes are delinquent, and uses corporate funds to pay other expenses..., our precedents *require* that the failure to pay withholding taxes be deemed 'willful.'") (emphasis added).

Undaunted by the harsh standard adopted in the Ninth Circuit, Baimbridge argues that there is nevertheless a genuine dispute as to whether his conduct was willful. First, Baimbridge argues that he had "reasonable cause" to pay non-IRS creditors, despite his knowledge of the tax delinquencies, because Soil Tech was experiencing severe financial difficulties and needed to pay other creditors to survive. In support of his position, Baimbridge cites to *Fran Corp. v. United States,* 164 F.3d 814, (2nd Cir.1999) and *Howell v. United States,* 164 F.3d 523 (10th Cir. 1998). Second, Baimbridge argues that Soil Tech's continued payment to non-IRS creditors was implicitly sanctioned in the installment agreement with the IRS, which contemplated future operations in order to pay down Soil Tech's delinquencies.

■ Unfortunately for Baimbridge, however, the Ninth Circuit has explicitly rejected these kind of "reasonable cause" arguments in section 6672 cases. As the courts have repeated countless times, "[n]o bad motive need be proved, and conduct motivated by reasonable cause, *such as meeting payroll,* may be 'willful.'" *Buffalow,* 109 F.3d at 573 (quoting *Phillips,* 73 F.3d at 942) (emphasis added). Additionally, the Ninth Circuit has held that excuses, such as Baimbridge's, "simply amount[ ] to [allegations] of 'reasonable cause' or 'justifiable excuse,' a defense which has been specifically rejected by this court." *Sorenson v. United States,* 521 F.2d 325, 329 (9th Cir.1975). In the Ninth

Circuit, the only fact that matters is that Baimbridge, knowing of or recklessly disregarding Soil Tech's tax delinquencies, made payments to non-IRS creditors. The presence of this fact is sufficient to conclude on summary judgment that the penalty assessments are valid.

Although the Court's inquiry would generally be at and end as to whether the valid penalties may be enforced, Baimbridge raises an estoppel argument that warrants attention. Baimbridge argues that the installment agreement should equitably estop the government from assessing penalties based on Soil Tech's continued operations post April 1995 (when he orally entered into the installment agreement with McGeorge). Specifically, Baimbridge argues that the government should not be able to enter into the installment agreement, which clearly contemplates Soil Tech's continued operation and payments to non-IRS creditors, and then assess tax penalties against Baimbridge for attempting to follow that arrangement.

Binding the government through equitable estoppel is no easy task, and Baimbridge follows in the wake of others that have failed to do so in this very context. "Before the government may be estopped, the aggrieved party must demonstrate [as a threshold matter] 'affirmative conduct going beyond mere negligence,' and must also show 'that the government's act will cause serious injustice and the imposition of estoppel will not unduly harm the public interest.'" *Purcell v. United States,* 1 F.3d 932, 939 (9th Cir.1993) (quoting *S & M Investment Co. v. Tahoe Regional Planning Agency,* 911 F.2d 324, 329 (9th Cir.1990)). Only if this initial showing is made does the Court address the general requirements of estoppel: "a misrepresentation by one party [that] is reasonably relied upon by a second party, who suffers detriment as a result." *Id.*

■ The Court finds that Baimbridge has at least demonstrated a genuine issue as to whether the government should be estopped from relying on non-IRS payments after the installment agreement was consummated. As to Baimbridge's threshold showing, he argues that this case is distinguishable from *Purcell*, where the Ninth Circuit found that the IRS agent had not engaged in "affirmative misconduct." In *Purcell*, the responsible person told an IRS agent that he planned on continuing business operations in hopes of paying down the tax delinquency in the future, and the IRS agent allegedly acquiesced in that course of action without informing the responsible person that he may be opening himself to liability under section 6672. The Ninth Circuit held that this was at most "a mere omission or negligent failure on [the agent's] part" rather than the type of "ongoing active misrepresentations or pervasive pattern of false promises" that would establish affirmative misconduct. *Purcell*, 1 F.3d at 940. In this case, however, viewing the evidence in a light most favorable to Baimbridge, the IRS agent went well beyond the type of "mere omission" at issue in *Purcell*. Here, McGeorge actually negotiated an installment agreement with Baimbridge, later memorialized on an IRS form entitled "Installment Agreement," which required him to submit monthly payments for past delinquencies *while continuing to operate his business*. At a minimum, Baimbridge has presented a material issue as to whether the government engaged in affirmative misconduct by entering into such an agreement, knowing that by adhering to it Baimbridge would expose himself to penalties under section 6672. Additionally, there can be no question that serious injustice may result from a penalty assessment being predicated on non-IRS payments which were contemplated by the installment agreement. Finally, the Court sees no reason why estoppel would unduly harm the public interest. To the contrary, if the government escapes estoppel here, the IRS's ability to use installment agreements would be severely diminished by a well-founded fear among taxpayers that such agreements will be used against them in the future.

As to the general requirements of equitable estoppel, Baimbridge has also made a sufficient showing to escape an adverse ruling on summary judgment. Clearly Baimbridge detrimentally relied on a misrepresentation when he entered the installment agreement and continued business operations as contemplated by the agreement. The government attempts to undermine Baimbridge's argument by pointing out that Baimbridge has not presented any evidence that (1) the installment agreement was signed by an appropriate IRS official and (2) Soil Tech complied with its terms. In making such arguments, however, the government forgets its place as the moving party in summary judgment. It is the government, not Baimbridge, that must first come forward with evidence as to the installment agreement's invalidity, and it has failed to do so. Moreover, it is unclear that the installment agreement must be signed by anyone other than Baimbridge, since it provides: "This agreement *may* require managerial approval. If it is not approved, you will be notified." (Lieberg Decl., Ex. 1 at 20). Further, Baimbridge correctly notes that the word "defaulted," which appears written across the first page of the agreement, begs the question of how one could possibly default on an invalid agreement. In sum, Baimbridge has demonstrated a genuine dispute as to whether the government should be estopped from assessing tax penalties based on Soil Tech's continued operation after April 1995 (the date of the installment agreement).

Regardless of its viability, however, there are important limits to the estoppel argument that Baimbridge fails to recognize. First, the installment agreement only encompasses the delinquencies from 1990, and those from the June 1994, September 1994, and December 1994 periods. It does not encompass the delinquency that arose later in December 1995. In fact, the installment agreement explicitly requires Baimbridge to "file all federal tax returns and pay any taxes [owed] on time." (Lieberg Decl., Ex. 1 at 20). Therefore, even if Baimbridge was ultimately successful on his estoppel argument, it would not estop the government from assessing the penalty for the December 1995 period. Because Baimbridge does not otherwise contest the December 1995 penalty, the government is entitled to a finding on summary judgment that this particular penalty is valid.

The second limit to Baimbridge's estoppel argument requires the Court to delve into whether he recklessly disregarded a risk of payroll tax delinquencies prior to April 1995. To the extent that Baimbridge relied on the government's misrepresentations in the installment agreement, that reliance cannot pre-date April 1995 when the installment agreement was first proposed. Thus, if Baimbridge "willfully" failed to collect or pay over Soil Tech's taxes prior to April 1995, the estoppel argument would become a moot point. As noted above, Baimbridge has presented a genuine dispute as to whether he had any *actual knowledge* of tax delinquencies prior to his April 1995 meeting with McGeorge. However, the government may still demonstrate pre-April 1995 liability if Baimbridge recklessly disregarded a risk of tax delinquencies before April 1995

and nonetheless made non-IRS payments.[10]

### b. Reckless Disregard

As noted above, Baimbridge first attempted to pay Soil Tech's June 1994 payroll taxes on August 5, 1994, but his check was dishonored. Subsequently, Baimbridge sent in another check, allegedly also designated for the June 1994 period, which cleared. The IRS, however, applied parts of the second payment to Soil Tech's 1990 delinquencies, leaving a delinquency for the June 1994 period. Subsequent checks that would have covered Soil Tech's payroll taxes in September 1994 and December 1994 were dishonored and no subsequent attempts were made to pay those delinquencies in full.

The government attempts to show that regardless of when Baimbridge had actual knowledge of Soil Tech's delinquencies for the June 1994, September 1994 and December 1994 periods, he recklessly disregarded whether the payroll taxes for those periods were paid, and subsequently made payments to non-IRS creditors. To support its contention, the government relies on the fact that in 1990, approximately four years before the periods at issue, Soil Tech was delinquent in its payroll tax obligations. This, the government argues, created a risk that Soil Tech would become delinquent again, and made it incumbent upon Baimbridge to ensure that the government was being paid before making payments to non-IRS creditors.

The Ninth Circuit has upheld findings of reckless disregard in similar situations where a responsible person impermissibly delegates the duty to pay over withheld taxes to a party that has failed to pay over the taxes in the past. *See, e.g.,*

---

10. Again, it is undisputed that Baimbridge made continuous non-IRS payments on behalf of Soil Tech from the date of the first delinquencies until Soil Tech ceased operations.

*Phillips,* 73 F.3d at 943 ("Even if the jury believed [the taxpayer's] account entirely, it could conclude that he should have asked [the delegatee] if she was paying the taxes, in light of her failure to pay them three years earlier."). Here, at least as to the June 1994 period, there remains a material dispute as to whether Baimbridge recklessly disregarded a risk that Soil Tech was delinquent in its payroll taxes. While it is true that Soil Tech was delinquent in its 1990 payroll taxes, the Court cannot say that, as a matter of law, Baimbridge was thereby obligated, after nearly four years of adequate payments, to double check with the IRS that his payment for June 1994 was not applied to other liabilities. To the contrary, it was reasonable for Baimbridge to assume that the second check, which eventually cleared, would be applied to the June 1994 period and extinguish any delinquency. Thus, the Court finds that there is a genuine dispute as to whether Baimbridge recklessly disregarded a risk that Soil Tech was delinquent in its June 1994 taxes when he subsequently made payments to non-IRS creditors.

The delinquencies in September 1994 and December 1994 are a different matter. After August 1994, when Baimbridge was informed that his check for the June 1994 period was dishonored, Baimbridge became aware of a serious risk that future checks might similarly be dishonored. Baimbridge attempts to defeat any notions that he recklessly disregarded a risk by noting that his officer manager, Mrs. Mason, testified that she would not have generated a check if she did not believe the check would be honored. (*See* Lieberg Decl. Ex. 3 at 107). After the first June 1994 check was dishonored, however, Baimbridge could no longer rely on Mrs. Mason's habits of not generating faulty checks. Baimbridge's case is no different from many Ninth Circuit cases which have unequivocally held that once a responsible party knows a delegatee failed to pay over withheld taxes, continuing to rely blindly on that delegatee amounts to reckless disregard. *See Phillips,* 73 F.3d at 943. Here, Baimbridge recklessly disregarded a risk that future checks would be dishonored by continuing to rely on Mrs. Mason's habit of only generating checks for which Soil Tech had sufficient funds to pay.

Additional evidence serves to remove any genuine dispute that Baimbridge recklessly disregarded a risk of payroll tax delinquencies as to the September 1994 and December 1994 periods. In his deposition, Baimbridge answered questions about informal discussions he had with other Soil Tech personnel about nonpayment of taxes. When asked about when the first of these discussions occurred, Baimbridge responded as follows:

> I'm sure it must have been shortly after I discovered that the first quarterly payroll tax deposit in '94 had bounced. And because it was an *ongoing problem,* I wanted to make sure that the principals [sic], involved in the company was [sic] fully aware of what our situation was and that I was taking full responsibility for all decisions.

(Hendon Decl., Ex. 4 at 19) (emphasis added). Clearly, Baimbridge was aware of a substantial risk that Soil Tech would continue, post June 1994, to have its checks dishonored and become delinquent on its payroll tax obligations. In light of this fact, Baimbridge was required to ensure that Soil Tech's checks to the IRS were actually honored before making additional payments to non-IRS creditors. Consequently, the Court finds summary judgment is appropriate as to whether Baimbridge willfully failed to pay over Soil Tech's payroll taxes for the periods of September 1994 and December 1994. Moreover, because Baimbridge's willful

failure to pay occurred prior to his meeting with McGeorge in April 1995, the equitable estoppel argument has no bearing on these two penalty assessments. Because there remains a genuine dispute as to whether Baimbridge recklessly disregarded a risk that Soil Tech was delinquent as to its June 1994 payment, however, the issue of whether the government should be estopped from enforcing that penalty assessment must proceed to trial.

### 2. Amount of the Assessments

Having determined that all penalty assessments are valid, but that the government may be estopped from enforcing the penalty assessment for the June 1994 period, the Court now turns to the issue of whether the amounts of the penalty assessments are correct.

### a. The June 1994 Penalty

For a claimant to overcome the presumption that the amount of an assessment is correct, he must prove that the assessment is excessive by a certain amount. *United States v. Schroeder*, 900 F.2d 1144, 1148 (7th Cir.1990). As noted above, penalty assessments under section 6672 may only be as large as the amount of outstanding tax liability for any particular period. Proof that the IRS misallocated a payment designated towards a specific liability, thereby creating a delinquency, is sufficient to overcome the presumption of correctness. *See Tull v. United States*, 69 F.3d 394, 399 (9th Cir.1995).

The IRS may allocate an undesignated voluntary payment to whatever liability is in the government's best interest.[11] *Buffalow*, 109 F.3d at 574. For example, to the extent that any of Baimbridge's payments during 1994 or 1995 were not designated towards a particular

tax period, the IRS could have applied those payments towards Soil Tech's 1990 delinquencies if it so desired. However, when a taxpayer designates a particular liability to which a voluntary payment should be applied, the IRS must apply the payment to the specified liability. *Id.* Delivery of a check with a tax return is generally sufficient to designate the payment toward the liability for the period of the return. *See* Internal Revenue Manual 56(18)3.1 (11–21–89).

The record shows that Soil Tech's total assessed tax for the June 1994 period was $36,820.90, and that Soil Tech initially made two payments totaling $5,963.83 toward that assessment. On August 5, 1994, Soil Tech submitted a "payment with return" for $30,857.07, the balance remaining on the June 1994 liability. This check was dishonored and the IRS notified Baimbridge.

Baimbridge contends that on August 23, 1994, at an in-person meeting with Revenue Officer Aviles ("Aviles"), he re-submitted a check for $30,857.07 along with a copy of the return for the June 1994 period. (Baimbridge Supp. Decl. at 1–2). The tax record for this period shows a payment of $30,857.07 on August 23, 1994. The IRS initially applied this payment to the June 1994 quarter, but then treated it as an overpayment and partially transferred it to the 1990 liabilities, leaving a delinquency for the June 1994 period.

Baimbridge disputed the June 1994 liability at the April 1995 meeting with McGeorge, apparently because he was unaware that the IRS had reallocated his second payment. The Investigative History notes from that meeting indicate that Baimbridge provided McGeorge with copies of the June 1994 return and the check

---

**11.** The IRS may also apply involuntary payments, such as amounts collected through levies, to whatever liability it chooses. *In re*

*Technical Knockout Graphics, Inc.*, 833 F.2d 797, 802 (9th Cir.1987).

that he had allegedly submitted to Aviles. He contends that IRS mistakenly treated the August 23, 1994 amount as an overpayment because it had not yet debited the dishonored amount from the August 5 payment.

██ If Baimbridge submitted the second payment without a copy of the return or did not otherwise designate the payment, then the IRS could consider the payment undesignated and allocate the payment as it saw fit (i.e., in a manner that left a delinquency for the June 1994 period). *See Davis,* 961 F.2d at 878. However, if Baimbridge designated the payment for the June 1994 liability and the IRS nonetheless allocated it to the 1990 liabilities, then Baimbridge's penalty assessment for June 1994 was incorrect and his liability should be reduced for that period. Viewing the evidence in a light most favorable to Baimbridge, the Court is left with a genuine dispute as to whether his August 23, 1994 payment was designated for the June 1994 tax period. Thus, the proper amount of the June 1994 penalty assessment is an issue that must be resolved at trial.

### b. The September 1994 Penalty

As stated before, a taxpayer can designate the liability to which a voluntary payment must be applied. *Buffalow,* 109 F.3d at 574. The record shows that Soil Tech's total assessed tax for the September 1994 period was $36,587.82, and that payroll tax comprised $25,760.41 of that total. Soil Tech submitted voluntary partial payments totaling $7,014.84 toward that assessment. These amounts were credited to Soil Tech's September 1994 liability, leaving a balance of $29,522.98 for that period.

On February 16, 1995, Baimbridge submitted a check for $10,500 to Aviles. Baimbridge alleges that this payment was designated for the September 1994 liability. This check was honored, but the IRS initially applied it to Soil Tech's 1990 liabilities, and later transferred it to the June 1994 period. Baimbridge's declaration that he designated this check for the period ending September 30, 1994 creates a genuine dispute as to whether the IRS properly applied this voluntary payment to the June 1994 period.[12] (Baimbridge Supp. Decl. at 2). Consequently, the proper amount of the September 1994 penalty is also an issue for trial.

### c. The December 1994 Penalty

Baimbridge argues, unconvincingly, that his liability for the December 31, 1994 period was extinguished on August 4, 1995, when he submitted payment of $539.13 after receiving a bill for that amount. The record shows that in 1995, Baimbridge entered the installment agreement which covered the delinquent tax from several periods, including December 1994. The record also indicates that Baimbridge was aware that the amount of the December 1994 tax liability was over $25,000. The installment agreement eventually failed, and the IRS assessed Baimbridge a penalty for the December 1994 period in the amount of $18,165.67 (the payroll tax portion of the taxes due for that period). The tax record indicates that Baimbridge's August 4, 1995 payment of $539.13 (which equaled the social security tax portion of his liability) was properly credited to Soil Tech's December 1994 tax liability. Thus, no genuine issues remain as to whether the amount assessed for the December 1994 period was correct. As a result, the

---

12. Because there is a factual dispute as to whether the check for $10,500 was designated for the September 1994 period, the Court does not reach the legal arguments raised by the parties as to how the alleged misapplication would affect the amount of Baimbridge's penalty assessment for that period.

government is entitled to judgment for $18,165.66.

#### d. The December 1995 Penalty

Baimbridge does not dispute the amount of the December 1995 penalty assessment. Therefore, the government is also entitled to judgment for $14,617.17.

#### e. The IRS seizure does not affect personal liability under section 6672

 Finally, Baimbridge contends that Soil Tech's accounts receivable, which the IRS levied upon in 1995, were sufficient to cover Soil Tech's entire tax liability for the periods at issue, and that the IRS's seizure of Soil Tech's assets made it impossible for Soil Tech to pay its tax liability. This argument fails to comprehend that a corporate officer's personal liability under section 6672 is entirely separate from the corporation's liability for the underlying tax. *Teel v. United States,* 529 F.2d 903, 906 (9th Cir.1976). Baimbridge became responsible for the payroll taxes at the time he withheld them, and the IRS's rightful seizure does not absolve him of this liability. *Id.*

Moreover, the IRS transcripts show that, despite the large number of accounts levied upon, the levies resulted in only two responses. One response indicated that the IRS levy had been preempted by a levy imposed by the State of California Franchise Tax Board. The other response yielded a recovery of only $1,102.75. The IRS properly applied this involuntary payment to Soil Tech's 1990 liabilities. Therefore, no genuine dispute remains as to whether the seizure or the administration of the levy improperly affected the amount of Baimbridge's personal liability under section 6672.

### CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART and DENIES IN PART** the government's motion for summary judgment. Specifically, the Court **GRANTS** summary judgment regarding the validity of the four penalty assessments, and finds that all four penalty assessments at issue are valid. However, there remains a material dispute as to whether the government is equitably estopped from enforcing the June 1994 penalty. The Court further **GRANTS** summary judgment regarding the amounts of the December 1994 and December 1995 penalty assessments, and finds that the penalty assessments for those two periods are correct. The Court therefore **ENTERS JUDGMENT** in the amount of $18,165.66 for the December 1994 period assessment and in the amount of $14,617.17 for the December 1995 period, plus accrued statutory interest, less any payments or credits, to the government.[13] Finally, the Court DENIES summary judgment on the issues of whether the amounts of the June 1994 and September 1994 penalty assessments are correct.

**IT IS SO ORDERED.**

---

**13.** The government indicates in its brief that, to the extent that the Court awards judgment as to any of the penalties at issue, it can stipulate with Baimbridge as to the exact amount of the judgment. Therefore, the Court leaves to the parties the issue of calculating the precise amount Baimbridge owes the government pursuant to the December 1994 and December 1995 penalties.