Steven C. **SCHROER,** Plaintiff,

v.

**UNITED STATES of America,** Defendant.

Civil Case No. **07–cv–00690–LTB–BNB.**

United States District Court, D. Colorado.

Jan. 21, 2009.

Steven C. Schroer, Boulder, CO, pro se.

James Edward Weaver, Nathaniel Benjamin Parker, Washington, DC, for Defendant.

### ORDER

LEWIS T. BABCOCK, District Judge.

This case is before me on the recommendation of the magistrate judge that defendant's Motion for Summary Judgment (Doc. 71) be granted. Plaintiff has filed specific written objections to the magistrate judge's recommendation. I have, therefore, reviewed the recommendation *de novo* in light of the file and record in this case. On *de novo* review I conclude that the magistrate judge has correctly applied the standards under Fed.R.Civ.P. 56 in finding and concluding that the motion for summary judgment should be granted. Having considered the full, exhaustive and well-reasoned recommendation *de novo* in light of plaintiff's detailed, specific written objections, I conclude that the magistrate judge's recommendation is correct. Accordingly,

IT IS ORDERED that defendant's Motion for Summary Judgment (Doc 71) is GRANTED and that judgment enter dismissing plaintiff's complaint against defendant.

### RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

BOYD N. BOLAND, United States Magistrate Judge.

This matter arises on the **Defendant's Motion for Summary Judgment** [Doc. # 71, filed 7/14/2008] and supporting brief and materials [Doc. # 72, filed 7/14/2008]. I respectfully RECOMMEND that the Defendant's Motion for Summary Judgment be GRANTED.

The plaintiff is a taxpayer who seeks the refund of tax penalties and interest assessed by and paid to the United States for the tax years 2000, 2001, and 2002. The plaintiff claims that penalties in the amount of $133,928.11 were improperly assessed. Complaint [Doc. # 1, filed 4/5/2007] at ¶¶ 9, 11, and 13.[1] The United

---

1. The unrefuted tax records submitted by the       United States in support of its motion for

States seeks an order of summary judgment in its favor, denying the plaintiff's claim for a refund. Brief In Support of Defendant's Motion for Summary Judgment [Doc. # 72] ("Defendant's Brief") at p. 25.

## I.

The parties do not seriously dispute the applicable law. The authority of the United States to assess penalties against taxpayers for failure to timely file tax returns and failure to timely pay taxes is set out at 26 U.S.C. § 6651(a)(1) and (2):

§ 6651. **Failure to file tax return or to pay tax**

(a) **Addition to the tax.**—In case of failure—

(1) to file any return required ... on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate;

(2) to pay the amount shown as tax on any return specified in paragraph (1) on or before the date prescribed for payment of such tax (determined with regard to any extension of time for payment), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount shown as tax on such return 0.5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 0.5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate....

The Supreme Court considered generally the meaning of § 6651 in *United States v. Boyle*, 469 U.S. 241, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985), and held:

A Treasury Regulation provides that, to demonstrate "reasonable cause," a taxpayer filing a late return must show that he "exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time." 26 C.F.R. § 301.6651–1(c)(1) (1984).

\* \* \*

Congress' purpose in the prescribed civil penalty was to ensure timely filing of tax returns to the end that tax liability will be ascertained and paid promptly. The relevant statutory deadline provision is clear.... To escape the penalty, the taxpayer bears the heavy burden of proving both (1) that the failure did not result from "willful neglect," and (2) that the failure was "due to reasonable cause." 26 U.S.C. § 6651(a)(1).

The meaning of these two statutory standards has become clear over the near–70 years of their presence in the

summary judgment establish that penalties in the following amounts were assessed against and paid by the Schroers: (1) with respect to tax year 2000, the IRS assessed a failure-to-timely-file penalty of $38,835, and failure-to-timely-pay penalties totaling $18,904.00; (2) with respect to tax year 2001, the IRS assessed a failure-to-timely-file penalty of $28,355.86, and failure-to-timely-pay penal-

ties of $21,814.39; and (3) with respect to tax year 2002, the IRS assessed a failure-to-timely-file penalty of $13,846.81, failure-to-timely-pay penalties totaling $8,744.05, and an estimated tax penalty of $3,428.00. *See* Exh. A–34 [Doc. # 73–40] (concerning tax year 2000); Exh. A–35 [Doc. # 73–41] (concerning tax year 2001); and Exh. A–36 [Doc. # 73–42] (concerning tax year 2002).

statutes. As used here, the term "willful neglect" may be read as meaning a conscious, intentional failure or reckless indifference.... Like "willful neglect," the term "reasonable cause" is not defined in the Code, but the relevant Treasury Regulation calls on the taxpayer to demonstrate that he exercised "ordinary business care and prudence" but nevertheless was "unable to file the return within the prescribed time." 26 C.F.R. § 301.6651–1(c)(1) (1984).

\* \* \*

Congress obviously intended to make absence of fault a prerequisite to avoidance of the late-filing penalty. A taxpayer seeking a refund must therefore prove that his failure to file on time was the result neither of carelessness, reckless indifference, nor intentional failure.

\* \* \*

The time has come for a rule with as "bright" a line as can be drawn consistent with the statute and implementing regulations. Deadlines are inherently arbitrary; fixed dates, however, are often essential to accomplish necessary results. The Government has millions of taxpayers to monitor, and our system of self-assessment in the initial calculation of a tax simply cannot work on any basis other than one of strict filing standards. Any less rigid standard would risk encouraging a lax attitude toward filing dates. Prompt payment of taxes is imperative to the Government, which should not have to assume the burden of unnecessary ad hoc determinations.

*Id.* at 245–49, 105 S.Ct. 687 (footnotes and internal quotations and citations omitted, except as noted).

■ Unless both reasonable cause and a lack of willful neglect are established, imposition of the penalties specified in § 6651 is mandatory. *Carlson v. United States,*

126 F.3d 915, 921 (7th Cir.1997). *See Fran Corp. v. United States,* 164 F.3d 814, 816 (2d Cir.1999)(stating that "[t]he IRS imposes mandatory penalties for failure to file returns [or] pay taxes ... unless the taxpayer can demonstrate that such failure was due to 'reasonable cause and not due to willful neglect' "). In addition:

"Failure to pay will be considered to be due to reasonable cause to the extent that the taxpayer has made a satisfactory showing that he exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship ... if he paid on the due date." 26 C.F.R. § 301.6651–1(c)(1).

In considering whether a taxpayer exercised ordinary business care and prudence, a court should consider all facts and circumstances of the taxpayer's situation, including the amount and nature of expenditures in light of income received prior to the date payment was due. A taxpayer exercises ordinary business care and prudence if he makes reasonable efforts to conserve sufficient assets in marketable form to satisfy his tax liability and nevertheless was unable to pay all or a portion of the tax when it became due. "Undue hardship" means more than mere inconvenience. It must be substantial financial hardship, for example, loss due to the sale of property at a sacrifice price.

*Carlson,* 126 F.3d at 921 (internal citations and quotations omitted, except as noted). "If a market exists, the sale of property at the current market price is not ordinarily considered as resulting in an undue hardship." *East Wind Industries, Inc. v. United States,* 196 F.3d 499, 505 (3d Cir.1999) (*quoting* Treas. Reg. § 1.6161–1(b)).

■ Financial difficulties may, under some circumstances, establish reasonable

cause for a failure to pay taxes. *Fran Corp.*, 164 F.3d at 820. Applicable Treasury Regulations "clearly require a factual assessment of the taxpayer's financial situation to determine whether [he] has exercised ordinary business care and prudence in responding to competing financial obligations." *Id.* at 819. *Accord PARCC Health Care, Inc. v. United States*, 238 F.Supp.2d 435, 441 (D.Conn.2002).

## II.

■ The plaintiff is proceeding *pro se*, and the pleadings of a *pro se* litigant ordinarily must be afforded a liberal construction, *Haines v. Kerner*, 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), although he must comply with the fundamental requirements of the Federal Rules of Civil Procedure. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir.1991). In this case, however, Mr. Schroer is a lawyer licensed to practice in this court, and he reports that his law practice involves litigation with a prestigious Chicago law firm. Schroer Decl. at ¶¶ 15–17, 79. Under these facts, I do not afford Mr. Schroer's submissions any special construction. *Smith v. Plati*, 258 F.3d 1167, 1174 (10th Cir.2001).

In ruling on a motion for summary judgment, the facts must be viewed in the light most favorable to the party opposing the motion, and that party must be afforded the benefit of all reasonable inferences to be drawn from the evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Rule 56(c), Fed.R.Civ.P., provides that summary judgment should be entered if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating by reference to portions of the pleadings, the discovery and disclosure materials on file, and any affidavits the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party opposing the motion is then required to go beyond the pleadings and designate evidence of specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. Only admissible evidence may be considered when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La–Z–Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir.1985). Affidavits must be based on personal knowledge and must set forth facts that would be admissible in evidence. *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir.1995) (internal quotations and citations omitted). "Conclusory and self-serving affidavits are not sufficient." *Id.*

■ To avoid a late penalty under § 6651, the taxpayer bears the burden of proof to establish that the failure to timely file a return and/or pay taxes was both due to reasonable cause and not due to willful neglect. *Craddock*, 149 F.3d at 1254–55. "Whether the elements that constitute 'reasonable cause' are present is a question of fact. What elements constitute 'reasonable cause' is a question of law." *Id.* at 1255.

## III.

I find from the parties' briefs and supporting documents that the following facts material to the resolution of the Defen-

dant's Motion for Summary Judgment are undisputed:

(1) For tax year 2000, Mr. Schroer received cash compensation from his employment in an amount exceeding $332,000. Exh. A–11 Part II [Doc. # 73–15] at pp. 9 and 13 of 113.[2]

(2) The Schroers' federal income tax return for tax year 2000 was due to be filed on October 15, 2001. Exh. A–34 [Doc. # 73–40] at p. 3 of 7. The return was not filed until August 18, 2002. Exh. A–14 [Doc. # 73–18] at p. 3 of 20.

(3) The Schroers owed federal income tax for tax year 2000 in the amount of $192,994. Exh. A–14 [Doc. # 73–18]. With the exception of $21,000 withheld in connection with the early withdrawal of retirement funds, Exh. A–14 [Doc. # 73–18] Form 2210 at Part II: line 11, the Schroers did not pay any of that tax liability through withholding or estimated payments when due in 2000 and early 2001. *Id.* at Form 2210, Part III: line 16.

(4) The Schroers were assessed a late filing penalty for tax year 2000 of $38,835.00, and were assessed a penalty for failure to timely pay their taxes for tax year 2000 of $18,904.00. Exh. A–34 [Doc. # 73–40] at pp. 3 and 5 of 7.

(5) For tax year 2001, Mr. Schroer received cash compensation from his employment in an amount exceeding $225,000. Exh. A–11 Part II [Doc. # 73–15] at pp. 19–28 of 113.

(6) The Schroers' federal income tax return for tax year 2001 was due to be filed on October 15, 2002. Exh. A–35 [Doc. # 73–41] at p. 3 of 8. The return was not filed until April 15, 2003. Exh. A–16 [Doc. # 73–20] at p. 3 of 19.

(7) The Schroers owed federal income tax for tax year 2001 in the amount of $143,157. Exh. A–16 [Doc. # 73–20]. The Schroers did not pay any of that tax liability through withholding or estimated payments when due in 2001 and early 2002. Exh. A–16 [Doc. # 73–20] Form 2210 at Part III: line 16.

(8) The Schroers were assessed a late filing penalty for tax year 2001 of $28,355.86, and were assessed a penalty for failure to timely pay their taxes for tax year 2001 of $21,814.39. Exh. A–35 [Doc. # 73–41] at pp. 3, 5, and 6 of 8.

(9) For tax year 2002, Mr. Schroer received cash compensation from his employment in an amount exceeding $309,000. Exh. A–11 Part II [Doc. # 73–15] at pp. 31–37 of 113.

(10) The Schroers' federal income tax return for tax year 2002 was due to be filed on August 15, 2002. Exh. A–36 [Doc. # 73–42] at p. 3 of 7. The return was not filed until October 14, 2003. Exh. A–18 [Doc. # 73–22] at p. 3 of 12.

(11) The Schroers owed federal income tax for tax year 2002 in the amount of $105,997.00. Exh. A–18 [Doc. # 73–22]. The Schroers did not pay any of that tax liability through withholding or estimated payments when due in 2002 and early 2003. Exh. A–37 [Doc. # 73–43] Form 2210 at Part III: line 17.

(12) The Schroers were assessed a late filing penalty for tax year 2002 of $13,846.81; assessed a penalty for failure to timely pay their taxes for tax year 2002 of $8,744.05; and assessed an estimated tax penalty of $3,428.00. Exh. A–36 [Doc. # 73–42] at pp. 3 and 5 of 7.

(13) Mr. Schroer had a history prior to tax year 2000 of incurring penalties for

---

**2.** Page references are to the page numbers attached to a document by the court's CM/ ECF system.

failing to timely file his tax returns and failing to timely pay his taxes, as follows:

(a) For tax year 1991, Mr. Schroer's tax return was filed in October 1992; he did not make any substantial payment against his 1991 tax liability until January 1993; and he did not completely discharge his tax liability until September 1993. He was assessed a penalty for failure to timely pay his 1991 taxes of $2,312.70. Exh. A–1 [Doc. # 73–2].

(b) For tax year 1992, Mr. Schroer's tax return was filed in October 1993; he did not make any substantial payment against his 1992 tax liability until March 1994; and he did not completely discharge his tax liability until September 1994. He was assessed a penalty for failure to timely pay his 1992 taxes of $3,137.49. Exh. A–2 [Doc. # 73–3].

(c) For tax year 1993, Mr. and Mrs. Schroer filed a joint return in October 1994; they did not make any substantial payment against their 1993 tax liability until February 1995; and they did not completely discharge their tax liability until June 1995. They were assessed penalties of $4,592.55, including a late filing penalty of $2,122.53, and penalties for failure to timely pay their 1993 taxes of $2,470.02. Exh. A–3 [Doc. # 73–4].

(d) For tax year 1994, Mr. and Mrs. Schroer filed a joint return in October 1995; they did not make any substantial payment against their 1994 tax liability until February 1996; and they did not completely discharge their tax liability until June 1996. They were assessed penalties of $5,333.91, including an estimated tax penalty of $2,419.83, and penalties for failure to timely pay their 1994 taxes of $2,914.08. Exh. A–4 [Doc. # 73–5].

(e) For tax year 1995, Mr. and Mrs. Schroer filed a joint return in October 1996; but they did not completely discharge their tax liability until January 1997. They were assessed penalties of $4,099.11, including an estimated tax penalty of $2645.07, and a penalty for failure to timely pay their 1995 taxes of $1,454.04. Exh. A–5 [Doc. # 73–6].

(f) For tax year 1996, Mr. and Mrs. Schroer filed a joint return in October 1997; they did not make any substantial payment against their 1996 tax liability until February 1998; and they did not completely discharge their tax liability until May 1998. They were assessed penalties of $6,727.99, including an estimated tax penalty of $1,737.00, and penalties for failure to timely pay their 1996 taxes of $4,990.99. Exh. A–6 [Doc. # 73–7].

(g) For tax year 1997, Mr. and Mrs. Schroer filed a joint return in October 1998; they did not make any substantial payment against their 1993 tax liability until February 1999, when they completely discharge their tax liability. They were assessed penalties of $7,028.39, including an estimated tax penalty of $3,633.02, and penalties for failure to timely pay their 1997 taxes of $3,395.37. Exh. A–7 [Doc. # 73–8].

(h) For tax year 1998, Mr. and Mrs. Schroer filed a joint return in November 1999; they did not make any substantial payment against their 1993 tax liability until February 2000, when they completely discharge their tax liability. They were assessed penalties of $8,837.99, including an estimated tax penalty of $2,087.00, a late filing penalty of $4,190.29, and penalties for failure to timely pay their 1998 taxes of $2,560.70. Exh. A–8 [Doc. # 73–9].

(i) For tax year 1999, Mr. and Mrs. Schroer filed a joint return in October 2000; they did not make any substantial payment against their 1999 tax liability until January 2001; and they did not completely discharge their tax liability until

early 2002. They were assessed penalties of $8,202.66, including an estimated tax penalty of $1,661.00, late filing penalties of $3,635.83, and penalties for failure to timely pay their 1999 taxes of $2,905.83. Exh. A–9 [Doc. # 73–10].

(14) The Schroers entered into a contract to sell their Chicago home to Brent and Phoebe Stark for $675,000. Schroer Decl. [Doc. # 94] at ¶ 24. Because this was a private sale which did not involve any realtors, Mr. Schroer valued the sales contract with the Starks at $725,000. *Id.* The sale was to close on July 14, 2001. *Id.*

(15) With respect to the anticipated proceeds from the sale of his Chicago home, Mr. Schroer states: "[W]e could realize as much as $300,000 or more in equity from the sale of the Evanston home. That amount would have been more than enough to catch up on expected 2000 taxes to become due in 2001 as well as for 2001 taxes to become due in 2002." *Id.* at ¶ 23.

(16) On June 29, 2001, the Starks breached the contract to purchase the Schroers' home. *Id.* at ¶¶ 27–28.

(17) The Schroers sold their Chicago home, with the assistance of realtors, in June 2002 for $645,000. *Id.* at ¶ 31.

(18) In June 2001, one year prior to the closing of the sale on their Chicago home, the Schroer's purchased a home in Boulder, Colorado, for $655,000.00. Exh. A–22 [Doc. # 73–26].

(19) In mid–2001, Mr. Schroer had "around $600,000 worth of retirement funds, which were not liquid." Exh. A–10 Part II [Doc. # 73–13] at p. 43 of 96.

(19) In late May or early June 2001, Mr. Schroer withdrew $139,000 of retirement funds to make the down payment on the Boulder home, with the intention of using funds from the sale of the Chicago home to "rollover" into the retirement account to avoid adverse tax consequences from the withdrawal. *Id.* at pp. 43 of 96 through 46 of 96.

## IV.

The imposition of penalties due to a taxpayer's failure to timely file a tax return and failure to timely pay taxes is mandatory unless the taxpayer can show that the failure "is due to reasonable cause and not due to willful neglect." 26 U.S.C. § 6651(a)(1) and (2); *Carlson,* 126 F.3d at 921. In this case, the United States claims that some or all of the Schroers' failures to file and pay resulted from "willful neglect," Defendant's Brief at p. 20, but for purposes of summary judgment it limits its arguments to a contention that Mr. Schroer cannot show any "reasonable cause" for his failures. *Id.* Mr. Schroer bears the burden of showing "reasonable cause." *Craddock,* 149 F.3d at 1254–55.

██ Mr. Schroer argues that reasonable cause exists for his failure to file tax returns and pay his taxes for tax years 2000, 2001, and 2002, based primarily on the buyers' breach of their contract to purchase Mr. Schroer's Chicago home. According to Mr. Schroer:

4. For reasons beyond my control, due to a severe unexpected downturn in income from 1996–2002, ... I was faced with a financial crisis by late 2000. In spite of my best efforts and a reasonable, prudent plan to solve the problem, a specific event in 2001 beyond my control was the proximate and real cause of the circumstances giving rise to the penalties now at issue.

5. More specifically, the government's brief entirely ignores the key causative event which caused the problems at issue relating to the timeliness of my 2000–2002 tax payments and filings. It was a particular event—a breach of contract occurring on June 29, 2001—(and

certainly **not** unrelated events from years earlier (1991–1996) that the government's brief so heavily focuses on while ignoring the relevant event) which was the legal cause of the penalties now at issue.

6. I made specific provision for timely payment of the balance of my 2000 taxes and other obligations due in 2001 and/or 2002 through a contract dated February 20, 2001, for the sale of my home in Evanston, Illinois, where I then lived. The contract was entered into prior to the April 15 original due date of my 2000 tax return. The sale was to close no later than July 14, 2001. My 2000 tax return was not due until at least August 15, 2001 (and an additional extension until October 15, 2001 was also available), so a closing by July 14, 2001, would have allowed me ample time to file and pay my 2000 taxes on a timely basis. The proceeds of a closing on July 14, 2001, would have resulted in freeing-up of home equity approaching $300,000, which was far more than my then-pending 2000 tax liability and sufficient to provide for my 2001 tax liability (which was not due until April 2002), and also freed assets for payment of 2002 taxes.

Schroer Decl. [Doc. 94] at ¶¶ 4–6.

In addition, Mr. Schroer relies on the downturn in his salary to support his claim of reasonable cause. In 1996 he joined the law firm of Fitch, Even, Tabin & Flannery ("FET & F"), with an assurance of an "initial partnership income of $300,000, which could also be expected to increase on an ongoing basis." *Id.* at ¶ 15. Rather than increasing, as Mr. Schroer expected, his income decreased, as follows:

| Year | Income |
|------|--------|
| 1996 | $300,000 |
| 1997 | 256,858 |
| 1998 | 222,823 |
| 1999 | 166,933 |

Schroer Decl. [Doc 94] at ¶ 17.[3]

In July 1997 and January 2000, Mr. Schroer's sons were born, "adding personal stress as well as financial burden." *Id.* at ¶ 21. Associated with that, Mr. Schroer's wife suffered "significant *post partum* issues following the birth of our second son...." *Id.* Again according to Mr. Schroer, however:

> [T]he health problems of taxpayer's wife have never been argued as a separate basis for abatement or refund of penalties, but rather as part of the entirety of the facts and circumstances which must be considered in this case as relevant to the plaintiff's state of mind ....

*Id.*

Mr. Schroer also claims that reasonable cause exists for his failure to file tax returns because the records necessary to prepare the returns were not available:

> The need to re-market the Illinois house and "stage" it required moving and shuffling of furniture, furnishings and other materials including records which had to be boxed and prepared for moving. Because records were unavailable, I filed a request for extension of time to file my 2000 tax return until August 15, 2001, and also obtained an additional extension until October 15, 2001. However, the records (both records for 2000 and partial year 2001) remained in boxes in Illinois until sometime in October 2001. At that time, out of desperation, my wife and I finally decided that the circumstance in Colorado was beginning to significantly damage our family's quality of

---

**3.** Mr. Schroer's income significantly increased beginning in 2000, when he earned $413,662. In 2001, his income dipped to $263,967; and in 2002, his income rose again to $403,645. Exh. A–11 Part II [Doc. # 73–15] at pp. 10, 26, and 34 of 113.

life, and we arranged for moving of the contents of our Illinois house to Colorado. When the moving van arrived, because the Colorado house was much smaller than the Illinois house, the garage was literally stacked with furniture and boxes from floor to ceiling, and the financial records were not reasonably accessible or organized. For practical purposes, the records needed to prepare my 2000 tax return remained unavailable until the summer of 2002. In any event, filing of a return appeared a futile, useless exercise to me, since until the closing of the Illinois house in June 2002, I simply had no ability to pay the accrued taxes. I was financially paralyzed and in a state of shock.

*Id.* at ¶ 34.

Mr. Schroer's difficulties, separately and taken together, do not constitute reasonable cause to excuse his failure to timely file his federal tax returns and timely pay his federal taxes.

The cases have made clear that "[a] taxpayer exercises ordinary business care and prudence if he makes reasonable efforts to conserve sufficient assets in marketable form to satisfy his tax liability and nevertheless was unable to pay all or a portion of the tax when it became due." *Carlson,* 126 F.3d at 921. Mr. Schroer claims that he made such a reasonable effort by entering into the contract for the sale of his Chicago home, which was unexpectedly breached by the purchasers through no fault of Mr. Schroer. A similar argument was made and rejected in *In re Hopkins,* 1991 WL 289179 (Bkrtcy.Colo. October 22, 1991). In *Hopkins,* the taxpayers asserted reasonable cause existed under 26 U.S.C. § 6651 for their failure to pay taxes because their cartage business failed when its sole contract (and the taxpayers' sole source of income) was terminated upon 30 days notice. *Hopkins,* 1991

WL 289179 at *1. The taxpayers attempted to obtain another contract to replace the one terminated, but were unsuccessful. *Id.* The court held that these facts did not constitute reasonable cause to justify the late payment of taxes, stating:

> The cause of the inability of the Plaintiffs to pay their estimated taxes lies not with the cancellation of their cartage contract. Rather it lies in their neglect to set aside sufficient funds, *as those funds were being earned,* to pay their estimated taxes when due.

*Id.* at *2 (original emphasis).

Similarly in this case, Mr. Schroer's inability to pay his taxes when due was not the result of the failure of the contract for the sale of his Chicago home. It was the result of his failure to conserve sufficient assets in marketable form to satisfy his tax liability, by setting aside earnings as they came in or otherwise. The Schroers' tax liability in 2000 was approximately $192,994. Exh. A–14 [Doc. # 73–18]. For that year, Mr. Schroer's cash compensation was $332,000. Exh. A–11 Part II [Doc. # 73–15] at pp. 9 and 13 of 113. The Schroers' tax liability in 2001 was $143,157. Exh. A–16 [Doc. # 73–20]. For that year, Mr. Schroer's cash compensation exceeded $225,000. Exh. A–11 Part II [Doc. # 73–15] at p. 19–28 of 113. The Schroers' tax liability in 2002 was $105,997. Exh. A–18 [Doc. # 73–22]. For that year, Mr. Schroer's cash compensation was $309,000. Exh. A–11 Part II [Doc. # 73–15] at pp. 31–37 of 113. It is clear that Mr. Schroer received enough compensation in each of the three tax years in question to pay the taxes when due, had he made reasonable efforts to conserve sufficient assets in a marketable form. He did not.

The Supreme Court held in the *Boyle* case that "Congress obviously intended to make absence of fault a prerequisite to avoidance of the late-filing penalty. A tax-

payer seeking a refund must therefore prove that his failure to file on time was the result neither of carelessness, reckless indifference, nor intentional failure." 469 U.S. at 247, 105 S.Ct. 687. Mr. Schroer certainly is not without fault in connection with his failure to pay his federal taxes on time. To the contrary, Mr. Schroer's difficulties in meeting his tax obligations was the result of his conscious and intentional financial planning. Mr. Schroer explained that planning in his Declaration, as follows:

63. I began paying estimated taxes in about 1983, when I first became a partner in my then-law firm, Faegre & Benson in Minneapolis.... Upon becoming a partner, my periodic (monthly) income did not increase, but payroll deductions for withholding taxes were no longer taken. Generally in the 1980's, I was given advances during a calendar year approximately 60% of my total income from the prior year. The balance would then be paid in a lump sum after year-end. This arrangement meant that in-year cash flow was substantially smaller than year-end income was expected to be. Thus, paying quarterly estimated taxes would substantially disrupt and reduce in-year cash flow out of proportion to the expected total income, the bulk of which was not expected actually to be received until January of the next year.

64. One means of raising funds in-year to make estimated tax payments was by borrowing. However, interest rates at that time for lines of credit for such purposes were expensive, commonly 8–10% or substantially more in some periods as I recall.

65. In the mid–1980's, I had discussions with a number of people, including colleagues and other professionals about a prudent way to deal with payment of estimated taxes. Among the people whom I remember discussing this subject with in the mid–1980's was Mitch Goldstein, then a prominent tax partner at Faegre & Benson in Minneapolis, and Nate Bergeland, then a certified financial planner also in the Minneapolis area. I came to understand that many professionals considered it financially prudent not to make estimated quarterly tax payments during the year, but rather to make larger, lump sum payments at year-end to cover yearly taxes. It was considered prudent to do so because the penalties under the tax code for under-estimating quarterly payments were relatively low, and that a taxpayer could properly come out better financially by leaving in-year income (if any excess was available) in common investments which yielded returns greater than the tax penalty rates for underestimating taxes during the year. Although I do not have a specific memory of my practice in this regard during the 1980's ... my best recollection is that I made quarterly tax payments when my in-year finances permitted, but often made a lump-sum tax payment at year end larger than quarterly estimates to cover the entire year's tax liability.

66. ... During tax years 2000–2002, I reported and paid total taxes of $193,600, $130,993, and $102,569, respectively. During the same three years, I reported and paid penalties for underestimating taxes in the amount of $4,429, $3,332, and $3,428, respectively. The penalties average 2.6% of total taxes, which was a far lower percentage than I would have paid had I borrowed money to pay all quarterly payments in-year, and also less than the rate of return that I was earning on my retirement savings. For example, [during 1991–1998] [m]y investments were concentrated in the "Growth Balanced Fund," which reported annual yields as high as 29.1% (1991) and a five-year average return of

15.77%. Thus, from a financial perspective, a reasonable jury should conclude that it was more prudent to pay the relatively low underestimate penalty established by congress [sic] than to borrow money at a higher rate of interest, or to reduce investments yielding much higher returns to make estimated payments as a rigid practice.

Schroer Decl. at ¶¶ 63–66.

Mr. Schroer made the conscious decision to put his personal financial interests ahead of his obligation to pay his federal income taxes. He could have borrowed money to pay his taxes when due, pending final distribution of his earned income. Or he could have saved money from current earnings or from a previous year so as to have a reserve to pay his taxes as they came due. He chose instead generally not to pay estimated taxes when due, and to face a large year-end tax bill, including estimated tax penalties, so as not to "disrupt and reduce in-year cash flow" and to use his money to invest in retirement accounts that earned high rates of return. Under these circumstances, it cannot be said that Mr. Schroer was without fault when in 2000, 2001, and 2002, his financial plan failed to work. Mr. Schroer's conduct runs directly afoul of the Supreme Court's admonition:

> Deadlines are inherently arbitrary; fixed dates, however, are often essential to accomplish necessary results. The Government has millions of taxpayers to monitor, and our system of self-assessment in the initial calculation of a tax simply cannot work on any basis other than one of strict filing standards. Any less rigid standard would risk encouraging a lax attitude toward filing dates. Prompt payment of taxes is imperative to the Government, which should not

have to assume the burden of unnecessary ad hoc determinations.

*Boyle,* 469 U.S. at 249, 105 S.Ct. 687.

Throughout the time period 2000 through 2002, while the Schroers failed to timely file tax returns and timely pay taxes, the family continued to live a privileged lifestyle. They purchased a home in Boulder for $655,000, Exh. A–22 [Doc. # 73–26]; purchased new furniture, Exh. A–24 Part II [Doc. # 73–30] at pp. 21–23 of 54; purchased a new Ford Explorer, Exh. A–10 Part II [Doc. # 73–13] at pp. 29–30 of 96; purchased a 160 acre hunting property in North Dakota, Exh. A–10 Part I [Doc. # 73–12] at pp. 79–81 of 98; and enrolled the children in a private school. Exh. A–24 Part II [Doc. # 73–30] at pp. 33–34 of 54.

Under similar facts, the court in *Carlson v. United States,* 126 F.3d 915, 922 (7th Cir.1997), held that the taxpayers had failed to show reasonable cause for their late payment of taxes, stating:

> The Carlsons provided no evidence that they exercised ordinary care and prudence in regard to their 1990, 1991, and 1992 income taxes. They presented no evidence that they attempted to conserve assets to meet their tax obligations. Paying taxes is one of only two sure things in life, yet the Carlsons allowed their tax liabilities to build over 3 years without taking significant steps to reduce or meet those liabilities. For instance, the Carlsons did not set aside funds out of Mr. Carlson's draw from his firm, make periodic payments when they could, seek financing during those years, or sell their Indiana property, which would have satisfied a large chunk of the IRS' bill.

A premise of the federal income tax is to tax income already earned. Unless other sources are available, such as savings or liquid investments, a taxpayer may be re-

quired to apply his earnings in one year to that year's taxes. In any event, reliance on a speculative financial transaction like the sale of real property at a given price and time, when that transaction ultimately fails, does not constitute reasonable cause for the failure to pay taxes when due. That is the lesson of *In re Jacobs,* 490 F.3d 913, 927 (11th Cir.2007) (holding that no reasonable cause existed for the failure timely to pay taxes where the taxpayer used income for substantial personal expenditures and to pay other debts, but not to pay his taxes); *Fran Corp.,* 164 F.3d at 819–20 (holding that no reasonable cause existed for the late payment of taxes where the taxpayer continued to pay rent to its president notwithstanding a sizeable debt owed by the president to the taxpayer which could have been used to offset the rent; leased and repaired a luxury automobile not essential to the taxpayer's business; paid "lavish and extravagant" entertainment expenses; and paid other creditors not essential to the taxpayer's business while failing to pay its taxes); and *Hopkins,* 1991 WL 289179 at *2 (finding no reasonable cause to excuse late payment of taxes where taxpayers failed to set aside funds as they were being earned to pay their taxes).

The birth of Mr. Schroer's sons in 1997 and 2000, and his wife's *post partum* problems after the birth of their second son, do nothing to advance his claim of reasonable cause for failing to timely file returns and pay taxes. Many taxpayers have children, often more than two, and that cannot be the basis for excusing late filing and payment. Although mental and emotional hardship caused by the serious illness of a family member may result in a finding of reasonable cause, the illness of Mrs. Schroer certainly does not meet that standard. In the *Carlson* case, for example, the court held that the financial and

mental strain caused by the taxpayers' son's manic depressive schizophrenia did not create reasonable cause, reasoning:

> [T]he type of illness or debilitation that might create reasonable cause is one that because of severity or timing makes it virtually impossible for the taxpayer to comply—things like emergency hospitalization or other incapacity occurring around tax time.

*Carlson,* 126 F.3d at 923. Mr. Schroer makes no such argument or showing here.

Nor has Mr. Schroer made a sufficient showing that the records necessary to prepare the tax returns on time were not available. The records were in boxes, sometimes in Chicago, sometimes in a garage in Boulder "stacked with furniture and boxes from floor to ceiling, and ... not reasonably accessible or organized." Schroer Decl. [Doc. # 94] at ¶ 34. There is no evidence that anyone other than Mr. Schroer packed the boxes, however, or that Mr. Schroer lacked the ability to control how the boxes were packed and organized. Mr. Schroer admits that he had control over the boxes and the ability to order them transported from Chicago to Boulder when necessary to prevent further damage to the "family's quality of life." *Id.* The fact that the boxes were voluntarily maintained in Chicago, and that they were later stored in a crowded garage in Boulder, is insufficient to show that the records were unavailable to constitute reasonable cause under 26 U.S.C. § 6651(a)(1).

The Tenth Circuit Court of Appeals has held that reasonable cause to excuse a late filing did not exist under conditions substantially more extreme than those presented here by Mr. Schroer. In *Craddock,* 149 F.3d at 1252–53, the taxpayer argued that he could not timely file his returns because (1) his business had experienced exponential growth and increased complex-

ity; (2) he had purchased a new accounting system that failed to perform as quickly and effectively as represented; (3) his accounting department had experienced a high rate of personnel turnover; (4) extensive audits of prior years' tax returns had diverted the efforts of his accounting department; and (5) the company had converted its accounting procedures from the accrual to the cash basis. The circuit court reversed the lower court's determination that these facts created reasonable cause for the late filing of tax returns, holding:

> Mr. Craddock failed to exercise "ordinary business care and prudence" in ensuring his returns were timely filed and failed to show that he was "unable" to file the returns on time. Mr. Craddock's reasons for his failure to timely file, such as his records or information could not be assimilated fast enough, his accounting staff was overworked, and his computer system was inefficient, are not reasonable cause. A taxpayer is expected in the exercise of ordinary business care and prudence ... not [to] take on such a load that he could not fulfill his own legal obligations within the required time. In addition, the unavailability of business records, unless such records are destroyed, is generally not a reasonable cause for failure to file a tax return. The complexity of one's affairs also does not give [rise] to reasonable cause. Nor does the preoccupation with audits constitute reasonable cause.

*Id.* at 1255 (internal quotations and citations omitted). Even under these extreme circumstances, the circuit court ruled that "[b]y allowing Mr. Craddock's situation to constitute 'reasonable cause,' we would open a Pandora's Box of excuses which would effectively erode tax return filing deadlines." *Id.* at 1257 n. 11.

Mr. Schroer makes special arguments with respect to the penalties charged in connection with his 2002 taxes. First, Mr. Schroer argues:

> 39. Following the closing of the sale of my Illinois home, I promptly made a payment to the IRS in the amount of $125,000 in August 2002.... Subsequently, in early December 2002, I made an additional payment of $17,000. Both of these payments in 2002 were applied by the IRS to my 2000 liability. The IRS gave me no advice that the payments might be applied any other way.

> 40. I did not then know that my payments in 2002 could have been designated as payments from my 2002 taxes (rather than overdue 2000 and 2001 taxes). I therefore did not know that, if my payments in 2002 were so applied, there would be no subsequent penalties assessed for 2002 for late payment ($8,744 plus interest), underestimate of taxes ($3,427 plus interest) or late filing ($13,847 plus interest). The IRS did not so advise me.

> 41. I now understand that there was no reason for me to allocate my payments aggregating $142,000 in 2002 to my 2000 taxes, rather than my 2002 taxes, and there were compelling reasons not to. Specifically, as the government's own calculations show, the penalties for year 2000 reached their maximum of 22.5% (for late filing), five months after the nominal filing date.... Thus, my late filing penalties for 2000 had reached their maximum amount, and it did not matter if I paid them sooner of later, and there was no reason to allocate any of my 2002 payments for that purpose.

> 42. The IRS could assess and collect penalties for 2002 totaling $26,018.86 for tax year 2002, only because it had first applied my August and December 2002

payments in that year to my year 2000 tax accounts.

Schroer Decl. [Doc. # 94] at ¶¶ 39–42.

■ The uncontroverted evidence establishes that the $125,000 payment made by Mr. Schroer was enclosed with his tax return for tax year 2000 and was accompanied by a letter which stated:

> Filed herewith is my year 2000 form 1040, with schedules and attachments. Also enclosed is my check in the amount of $125,000, which is all I am presently able to pay.

Exh. A–14 [Doc. # 73–18]. "Delivery of a check with a tax return is generally sufficient to designate the payment toward the liability for the period of the return." *Baimbridge v. United States*, 335 F.Supp.2d 1084, 1095 (S.D.Calif.2004). In any event, the letter makes clear that Mr. Schroer intended the $125,000 payment to be applied to the tax year 2000 liability, and under those circumstances, "when a taxpayer designates a particular liability to which a voluntary payment should be applied, the IRS must apply the payment to the specified liability." *Id.* With respect to the $17,000 payment, Mr. Schroer made no indication as to the tax year's liability against which it should be applied. "It is well established that in the absence of a direction by the taxpayer the IRS can apply a payment to any outstanding liability of the taxpayer." *Wood v. United States*, 808 F.2d 411, 416 (5th Cir.1987)(internal citations omitted); *Baimbridge*, 335 F.Supp.2d at 1095 (stating that "[t]he IRS may allocate an undesignated voluntary payment to whatever liability is in the government's best interest").

■ Mr. Schroer also argues that in late 2002 he engaged the services of tax advisors at JK Harris & Co. Schroer Decl. [Doc. # 94] at ¶ 44. Mr. Schroer claims that he directed his tax advisors to obtain an extension of the filing deadline for his 2002 tax return, *id.* at ¶ 48, although he does not indicate the length of the extension he expected. Other materials contained in the notes maintained by JK Harris indicate that Mr. Schroer did not expect an extension including, for example, his inquiry that "[y]our [JK Harris'] e-mail does not confirm the filing of my 02 Fed/state tax returns when due on Aug. 15. Please confirm same and send me copies." *Id.* at ¶ 51. Regardless, Mr. Schroer cannot pass the blame to JK Harris for failing to obtain an extension, and thereby escape the imposition of late filing penalties. As the Supreme Court stated in *Boyle*:

> Congress has charged the [taxpayer] with an unambiguous, precisely defined duty to file the return within [a specified time]; extensions are granted fairly routinely. That the [tax advisor], as the [taxpayer's] agent, was expected to attend to the matter does not relieve the principal of his duty to comply with the statute.
>
> *       *       *
>
> [O]ne does not have to be a tax expert to know that tax returns have fixed filing dates and that taxes must be paid when they are due. In short, tax returns imply deadlines.
>
> *       *       *
>
> It requires no special training or effort to ascertain a deadline and make sure that it is met. The failure to make a timely filing of a tax return is not excused by the taxpayer's reliance on an agent, and such reliance is not "reasonable cause" for a late filing under § 6651(a)(1).

469 U.S. at 252, 105 S.Ct. 687.

Similarly, in *Twin City Construction Co. of Fargo v. United States*, 515 F.Supp. 767 (D.N.D.1981), a taxpayer sought to estab-

lish reasonable cause for the late filing of his return based on his tax advisor's failure to obtain an extension. The court rejected the argument, reasoning:

> Plaintiff [taxpayer] argues that the cases dealing with late filing of returns are distinguishable from the instant case where an application for an extension of time is untimely filed.... Plaintiff contends that as opposed to a tax return which must be personally signed by the taxpayer, an application for an extension of time to file can be signed by a certified public accountant. Plaintiff's argument is misplaced. First, the IRS imposed the penalty, not for an untimely filing of the application for extension, but rather for the late filing of the return and delinquent payment of the tax. The latter duty is clearly nondelegable where the taxpayer knows of his filing obligation and of the due date. Furthermore, an application for extension is not complete until the taxpayer submits payment for one-half of its estimated tax liability. Finally, if it does not constitute reasonable cause for a taxpayer to rely on his accountant to timely file his income tax return when the taxpayer knows he is legally required to file a return and knows when it must be filed, it would be anomalous to say that it constitutes reasonable cause for the same taxpayer to rely on his accountant to file an application for an extension.

*Id.* at 770.

Finally, Mr. Schroer argues that JK Harris obtained an oral extension of the filing deadline from Revenue Officer Steven C. Peterson. According to Mr. Schroer:

> 57. Finally, on October 6, 2003, JKH representative Bauman had a conversation with Revenue Officer Peterson. Peterson "asked when the 2002 return will be filed." Asking RO Peterson to hold, Bauman agreed to call (while Peterson was waiting) the JKH tax preparer, Sonja Cromwell, to get an answer to that question, and "RO [Peterson] agreed." After speaking to Cromwell, Bauman told Peterson that "we could get the completed returns to him by Next Friday." **And the IRS expressly so agreed: "RO [Revenue Officer Peterson] stated he will give us until Monday, October 20, 2003 to have the return in his office."** ... Thus, Mr. Peterson, the IRS' agent, granted the extension until October 20, 2003.

Schroer Decl. [Doc. # 94] at ¶ 57.

The portion of the Client Notes quoted by Mr. Schroer in support of this argument is taken out of context. To the contrary, the Client Notes, when read in context, make it clear that Revenue Officer Peterson agreed only to delay collection and enforcement actions against Mr. Schroer, and not to extend filing deadlines. Specifically, Mr. Bauman recorded his understanding of the agreement with Revenue Officer Peterson and reported it to Mr. Schroer in an e-mail, which states:

> I spoke with the IRS RO Mr. Peterson today. *He is willing to hold off on levy action* to allow time to:
>
> 1. Straighten out the confusion over the Lien Subordination/ Refinance of your home. The RO wants a copy of the Request with all attachments.
>
> 2. Provide him with an address for your Benson Keough so he can levy it for $100,000. The RO said he will not levy the other accounts so they can be used to pay your Federal & State taxes on the withdrawn funds.
>
> 3. *File your ORIGINAL 2002 Form 1040 with him for processing.*
>
>        *     *     *
>
> *All of the above MUST be in the RO's office by 10/20/03 or the RO said he will*

*send out levies (plural).* If there is a problem, I am to call the RO back to inform him.

Schroer Decl. at Exh. 8 [Doc. # 94–9], p. 11 of 13 (emphasis added). Mr. Bauman's e-mail to Mr. Schroer is consistent with Revenue Officer Peterson's recollection of the agreement. *See* Declaration of Steven C. Peterson [Doc. # 98, filed 9/8/2008] at ¶¶ 7–8.

Nothing done by Revenue Officer Peterson establishes reasonable cause for the late filing of the Schroers' 2002 tax return.

The undisputed facts establish that the Schroers failed to exercise ordinary business care and prudence in their financial affairs to justify their failures to timely file tax returns and to timely pay taxes for years 2000, 2001, and 2002. Consequently, Mr. Schroer's claim for a refund of the penalties and interest assessed and paid is barred, and the United States is entitled to the entry of summary judgment in its favor as a matter of law.

## V.

I respectfully RECOMMEND that the Defendant's Motion for Summary Judgment be GRANTED.

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have 10 days after service of this recommendation to serve and file specific, written objections. A party's failure to serve and file specific, written objections waives *de novo* review of the recommendation by the district judge, Fed.R.Civ.P. 72(b); *Thomas v. Arn,* 474 U.S. 140, 147–48, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colorado Dept. of Corrections,* 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse,* 91 F.3d 1411, 1412–13 (10th Cir.1996). A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review. *United States v. One Parcel of Real Property,* 73 F.3d 1057, 1060 (10th Cir.1996).